

FILED
at Santa Fe, NM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

OCT 1 9 2006

MATTHEW J. DYKMAN
CLERK

DEBRA LOPEZ, KATHY ROMERO,
MONIKA SANDOVAL and SHANTEL ULIBARRI

     Plaintiffs,

vs.

Case No. **CN – 0 6 –** ^ **MCA** ‥

FORBA, LLC, a Colorado limited liability company,
SMALL SMILES DENTISTRY FOR CHILDREN
SANTA FE, PC, a New Mexico Professional Corporation,
DANIEL E. DeROSE a/k/a EDDIE DeROSE, MELVIN
TAKAKI, PATRICK McQUITTY and JOSH NEIL,
Individually and on behalf of FORBA, LLC and/or
Small Smiles Dentistry for Children, PC, and DOES 1-10,

    Defendants.

### NOTICE OF REMOVAL

     The Defendants, by and through their attorneys, Long, Pound & Komer, P.A., hereby give notice of removal, and state to the Court that they are named as defendants in a civil suit which was filed in the First Judicial District Court, County of Santa Fe, State of New Mexico, Case No. D-0101-CV-2006-02152. The original complaint was filed in the State Court on September 25, 2006. A first amended complaint was filed on September 26, 2006. Pursuant to 28 USC §1446(b), this Notice is being filed within thirty (30) days of the date the case became eligible for removal. The plaintiffs in this case are Debra Lopez, Kathy Romero, Monika Sandoval and Shantel Ulibarri.

### STATEMENT OF GROUNDS FOR REMOVAL

     The grounds for removal are as follows:

     1.    The claims against the Defendants, as expressly stated in the complaint, include causes of action pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as



amended. 42 U.S.C. §§ 2000e, *et seq.*; the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et seq.*; and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* Accordingly, the Defendants are parties to a civil action in which the United States District Courts have original jurisdiction founded under a claim or right arising under the laws of the United States (28 U.S.C. §1441(b)). In addition, the civil action brought against the Defendants is one of which the District Courts of the United States have original jurisdiction (28 U.S.C. § 1441(a)).

2.      A copy of the First Amended Complaint is attached hereto as Exhibit A. Pursuant to 28 USC §1441(b) and D.N.M. LR-Civ. 81(a) 1996, copies of all New Mexico District Court records of this case existing in the file from the First Judicial District Court will be filed with this Court within thirty (30) days of the filing of this notice.

3.      Venue lies with this Court because the place where the action is now pending is within the District of New Mexico.

4.      In accordance with 28 U.S.C. § 1446(d), Defendants have served copies of this Notice of Removal on Plaintiffs' counsel and with the Clerk of the First Judicial District County of Santa Fe, State of New Mexico.

LONG, POUND & KOMER, P.A.
*Attorneys for Defendants*


NANCY R. LONG
2200 Brothers Road
P. O. Box 5098
Santa Fe, NM  87502-5098
505-982-8405
505-982-8513 (FAX)

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October, 2006, a true and correct copy of the foregoing Notice of Removal was mailed first class, postage prepaid, to the following counsel of record:

Merit Bennett, Esq.
Talia V. Kosh, Esq.
BENNETT & KOSH
460 St. Michael's Drive, Suite 703
Santa Fe, NM 87505

NANCY R. LONG

STATE OF NEW MEXICO
FIRST JUDICIAL DISTRICT
COUNTY OF SANTA FE

Cause No. D-101-CV-06-2152

DEBRA LOPEZ, KATHY ROMERO,
MONIKA SANDOVAL and SHANTEL ULIBARRI,

      Plaintiffs,

vs.

FORBA, LLC, a Colorado limited liability corporation,
SMALL SMILES DENTISTRY FOR CHILDREN SANTA FE, PC,
a New Mexico Professional Corporation, DANIEL E. DeROSE
aka EDDIE DeROSE, MELVIN TAKAKI, PATRICK McQUITTY
and JOSH NEIL, individually and on behalf of Forba, LLC, and/or
Small Smiles Dentistry for Children, PC, and DOE'S 1-10,

      Defendants.

ENDORSED
First Judicial District Court

SEP 2 6 2006

Snoia Fe, Rio Arriba &
Los Alamos Counties
P.O. Box 2268
Santa Fe, NM 87504-2268

**FIRST AMENDED COMPLAINT FOR SEXUAL DISCRIMINATION; SEXUAL
HARASSMENT; AGE DISCRIMINATION; DISABILITY DISCRIMINATION;
VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT, TITLE VII OF THE
CIVIL RIGHTS ACT OF 1964, AS AMENDED, AGE DISCRIMINATION IN
EMPLOYMENT ACT OF 1967 AND AMERICANS WITH DISABILITIES
ACT OF 1990; WRONGFUL TERMINATION AND RETALIATION;
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; PHYSICAL
AND PSYCHOLOGICAL ASSAULT, BATTERY AND SEXUAL ASSAULT;
NEGLIGENT HIRING, RETENTION, SUPERVISION AND MANAGEMENT;
BREACH OF AND/OR INTENTIONAL INTERFERENCE WITH CONTRACT;
RETALIATION; CIVIL CONSPIRACY; PRIMA FACIE TORT;**

      COME NOW Plaintiffs Debra Lopez (hereinafter, "Ms. Lopez"), Kathy Romero (hereinafter

"Ms. Romero"), Monika Sandoval (hereinafter "Ms. Sandoval") and Shantel Ulibarri (hereinafter

"Ms. Ulibarri") (also collectively hereinafter referred to as "Plaintiffs"), by and through their

counsel, Merit Bennett and Talia Kosh of Bennett & Kosh, and for their Complaint against

Defendants, state as follows:

EXHIBIT

A

## ESSENTIAL FACTS

This case involves a sexually toxic and discriminatory work environment in the Small Smiles dental clinic in Santa Fe, New Mexico, one of the thirty-five Small Smiles Clinics operated and managed by FORBA, LLC, around the country, perpetrated by male dentists and their male assistant with utter disregard for the rights and feelings of their female employees and encouraged, condoned and ratified by at least one of the owners and operators of Small Smiles and/or FORBA, LLC, which is headquartered in Pueblo, Colorado.

This toxic work environment included sexual fornication during working hours; sexual harassment and humiliation of female employees in the presence of young patients and their parents; daily disparaging comments made to Plaintiffs concerning their breast size, sexual abilities and, for some, their age; and daily boasting by the male defendants of their sexual prowess. Two of the Plaintiffs were sexually assaulted by Dr. McQuitty, one by Dr. DeRose. Young children who were patients of the clinic were also assaulted and mistreated.

The sexual toxicity of this workplace was hostile and pervasive, causing Plaintiffs to suffer severe and extreme emotional distress and humiliation and eventually resulting in their unlawful termination from their employment.

**GENERAL ALLEGATIONS:**

1.      Defendant FORBA, LLC, (hereinafter "FORBA") is a Colorado corporation, based in Pueblo, Colorado, believed to be doing business as and/or managing Small Smiles Dentistry for Children Santa Fe, PC, and Small Smiles Dentistry for Children Albuquerque, PC (hereinafter individually and/or collectively referred to as "Small Smiles"). FORBA is believed to manage

2

and/or own approximately thirty-five dental clinics throughout the United States, most or all of which are doing business under the name "Small Smiles."

2.      Small Smiles provides dental services for children up to 21 years of age, purportedly mostly serving underprivileged children whose families are on Medicaid or Medicare.

3.      Defendants Patrick McQuitty (hereinafter "Dr. McQuitty") and Melvin Takaki (hereinafter "Dr. Takaki") are managing dentists at Small Smiles' Santa Fe clinic. Defendant Josh Neil (hereinafter "Mr. Neil") was an employee at Small Smiles' Santa Fe clinic and is now an employee at Small Smiles' Albuquerque clinic. Defendant Daniel E. DeRose aka Eddie DeRose (hereinafter "Dr. DeRose") is believed to be an officer and/or owner of FORBA and/or Small Smiles and manages/supervises Small Smiles' clinics in Santa Fe and Albuquerque. At all times pertinent herein, all of these Defendants were employed by and/or acting on behalf of Small Smiles and/or FORBA.   Defendants Doe's 1-10 are yet-to-be-identified persons connected with the named Defendants who may also be liable to Plaintiffs for the harm they have suffered.

4.      Jurisdiction and venue are proper in this Court.

5.      At all times pertinent herein, Plaintiffs were employed by Small Smiles and/or FORBA. Plaintiffs are residents of Santa Fe County, New Mexico, and were mistreated and wrongfully terminated from their employment in violation of State and Federal law.

6.      Ms. Lopez, age 43, began working for Small Smiles in January of 2001 as a front office hygiene coordinator.  One year later, Ms. Lopez was promoted to "dental assistant," and she worked in the operating room.  She was terminated on November 2, 2005.

3

7.     Ms. Romero, age 50, began working for Small Smiles in November of 2001 as a billing coordinator, with office managerial duties. She worked under the office manager, Ms. Sharon Ludi.  Ms. Romero was terminated in October, 2005.

8.     Ms. Sandoval, age 38, began working for Small Smiles in November, 2002.  She was terminated on her birthday in November, 2005.

9.     Ms. Ulibarri, age 18, began working for Small Smiles on June 21, 2005. Ms. Ulibarri was 17 years old when she began working for Small Smiles. She was terminated on February 14, 2006.

10.     **Over the course of the employment of Ms. Romero, Ms. Lopez , Ms. Sandoval and Ms. Ulibarri, each was, among other things, subjected to illegal and unwanted sexual touching, gender discrimination and/or sexual harassment by the Defendants at Small Smiles, and the facts which substantially describe most of the incidents are set forth below.  Ms. Lopez and Ms. Romero were also subjected to unlawful age discrimination, and Ms. Sandoval was unlawfully discriminated against because of her medical disability.**

11.     The sexual harassment of Plaintiffs by Dr. McQuitty and Mr. Neil was persistently pervasive, directed at Plaintiffs individually and by forcing them to witness sexually offensive misconduct perpetrated upon other female employees in their presence.

12.     Dr. McQuitty and Mr. Neil engaged in continuous and offensive touching of female employees, including Plaintiffs, creating a hostile and sexually abusive work environment. This behavior was repeatedly reported by Plaintiffs to Dr. Takaki, the director of Small Smile's Santa Fe clinic, and to other supervisory dentists, but no remedial action was ever undertaken.  In fact, such

4

reports were used by Dr. Takaki and Dr. McQuitty to further harass and intimidate their female staff, specifically Ms. Lopez, Ms. Romero, Ms. Sandoval and Ms. Ulibarri.

13.    Employees at the Small Smiles office were to report to either Dr. Takaki or Dr. McQuitty in the event they had a complaint or any issue with their employment.  Employees were further instructed to never report a complaint to any other supervisor or manager above Drs. Takaki and McQuitty, including to anyone at the home office in Pueblo, Colorado, and, if they did so, their job would be in jeopardy.

14.    Retaliation against Plaintiffs for complaining of illegal misconduct and sexual harassment took the form of constant and escalated mistreatment, finally resulting in the wrongful termination of Plaintiffs' employment.   Dr. Takaki was present during and participated in and/or aided, abetted or condoned most of the sexual harassment that occurred at the clinic.

15.    Additionally, Dr. DeRose, one of the operators and/or owners of FORBA, LLC, and/or Small Smiles was not only aware of much of the illegal misconduct perpetrated by Dr. McQuitty and Mr. Neil, but Dr. DeRose also engaged in offensive touching and sexual harassment of and sexual discrimination directed against Ms. Lopez and other female staff.

16.    Dr. McQuitty, Mr. Neil and/or Dr. Takaki also engaged in the commission of other illegal misconduct at Small Smiles, including committing Occupational Safety and Health Administration ("OSHA") violations, professional mistreatment of patients and physical assault of patients and Plaintiffs.

17.    Because several female employees consented to sexual activity with Defendants and otherwise did not object to the harassment of Plaintiffs and other female staff, Plaintiffs have

5

designated them with pseudonyms Jane Does 1-10 in describing their participation in this complaint in order to prevent them from suffering initial public exposure and embarrassment. However, their anonymity is only temporary, as their identities can be easily determined by Defendants in the context of the facts recited below and will be fully disclosed during the discovery phase of this litigation and, of course, at trial.

### SPECIFIC ALLEGATIONS:

18.     In the case of Ms. Lopez, she  was sexually harassed, physically assaulted and battered and sexually discriminated against because of her gender and age by Dr. McQuitty, Dr. Takaki and Mr. Neil.

19.     In the presence of other employees and patients in the Small Smiles office, Dr. McQuitty would say to Ms. Lopez such things as, **"How much do you think your breasts weigh?"** Dr. McQuitty would also openly rebuke Ms. Lopez for dating "someone older" than she, referring to her husband. Dr. McQuitty would say, **"You need to find someone your own age, someone who can keep up with you."**

20.     Dr. McQuitty was constantly making personal comments to Ms. Lopez and prying into her personal affairs, even though Ms. Lopez made it clear to Dr. McQuitty, Dr. Takaki and other employees that this made her feel extremely violated. Almost everything Dr. McQuitty would say to the female staff was laced with sexual innuendo.

21.     Dr. McQuitty would refer to Ms. Lopez around the office as "Big Boob McGee." Dr. McQuitty would call Ms. Lopez this name so frequently that other employees began to use it, as well. On one occasion, Dr. McQuitty told Ms. Lopez, **"Wow! Those [her breasts] are huge,"** while

staring at her breasts. **"I wonder; are those real?"** Later, when Dr. McQuitty came into the office lounge, where Ms. Lopez and the rest of the staff were assembled (mostly female staff), Dr. McQuitty went up to Ms. Lopez and told her that his wife, Tammy, **"had implants"** and asked Ms. Lopez, **"What would you say they [Ms. Lopez' breasts] weigh?"** Dr. Haley Ritchey, the only female dentist then at Small Smiles and one of Plaintiffs' supervisors, told Dr. McQuitty, **"That is too much information!"** This experience was extremely degrading and offensive, causing Ms. Lopez to suffer severe emotional distress.

22.    On another occasion, Mr. Neil said to Ms. Lopez, **"Deb, you should get a wheelbarrow for your boobs so you don't have to carry them around all day. Dr. McQuitty was present and he laughed at Mr. Neil's remark.**

23.    Plaintiffs and other female employees at Small Smiles would regularly complain to Dr. Takaki, Dr. McQuitty and/or Dr. Ritchey about Mr. Neil's sexually abusive behavior, to no avail.

24.    On one of the many occasions that Mr. Neil was sexually harassing Ms. Lopez, he suggestively asked Ms. Lopez, **"Hey, Deb, what happens when it's hot outside and your balls stick to your leg?"** Ms. Lopez told Mr. Neil to stop making such "sick" remarks. Mr. Neil then said to Ms. Anna Abeyta, another female employee, and to Ms. Sandoval, **"Are you getting mad? I can say what I want when I want. Deb [Ms. Lopez] never gets mad."**

25.    Ms. Lopez then went directly to Dr. Takaki and reported Mr. Neil's sexual comments and harassing behavior. Dr. Takaki only said, **"I will talk to you later."** In fact, Dr. Takaki never

7

talked to Ms. Lopez about Mr. Neil's behavior and never reprimanded nor otherwise disciplined Mr. Neil. Of course, Mr. Neil's behavior did not change, and the harassment continued.

26.     Later that same day (after she had reported Mr. Neil's offensive behavior to Dr. Takaki), Ms. Lopez was with Dr. McQuitty and Mr. Neil.   Mr. Neil asked Ms. Lopez, **"How old are you? How many grandmas does it take to work in hygiene?"** Ms. Abeyta (who was in her late 40's) told Mr. Neil to get back to his work. Mr. Neil replied,  **"I run circles around you women, and if I put all you women together, I'd still be top dog. That's why I make big bucks!"** Dr. McQuitty was present for this harassment but said nothing to Mr. Neil.

27.     In the presence of female staff, **Mr. Neil would intentionally touch his penis on the outside of his pants with his hand and dramatically "adjust himself."** Mr. Neil often stated to Plaintiffs after touching his penis, **"I can't help it; I'm just so big."** Ms. Lopez, in an effort to get him to stop, told him, "I've never met anyone who constantly touches himself," to which Mr. Neil rudely replied, **"You should have married someone younger."**

28.     Ms. Noel McCann (in her late 40's), another employee in the office, reported Mr. Neil's above-described behavior to Dr. Takaki. Dr. Takaki, as usual, never talked to Mr. Neil about his misbehavior and never spoke with Ms. Lopez about her discomfort with Mr. Neil's sexual harassment of her.

29.     On another occasion, in the presence of Mr. Neil and Dr. Ritchey, Dr. McQuitty told Ms. Lopez, **"You look swollen [referring to Ms. Lopez' breasts]."** Mr. Neil added, **"Yeah, she's gaining in her… [breast size],"** grabbing his chest. Then Mr. Neil stated, **"Man, if I just see a wiggle [of Ms. Lopez' breasts], it's on!"** [referring to the fact that Mr. Neil was aroused by Ms.

Lopez' breasts].   Instead of stopping the harassment, Dr. McQuitty callously said to Ms. Lopez, **"You know you like it!"**

30.    In August of 2005, Dr. McQuitty said to Ms. Lopez, **"Wow, Deb! That's a nice shirt. I like that."** Dr. McQuitty then pushed his hips forward and said, **"Do you like my butterfly [referring to his crotch]?"** Dr. Ritchey was present and said, **"Deb, he's not looking at your shirt,"** pointing out to her that Dr. McQuitty was obviously referring to Ms. Lopez' breasts.

31.    On one occasion in the lounge, Ms. Lopez mentioned to Dr. Ritchey that her back was hurting. Dr. Ritchey said, **"Maybe you should get a breast reduction. Then you won't be the brunt of the men's jokes."** Even though Dr. Ritchey was trying to protect Ms. Lopez from sexual harassment, her suggestion of a breast reduction indicated how far the harassment had progressed and that Ms. Lopez had no effective remedy whatsoever against it.

32.    Dr. Ritchey was also sexually harassed by Dr. McQuitty. Dr. McQuitty would frequently tell Dr. Ritchey, **"You wear those clothes well,"** in addition to other comments, which Dr. Ritchey disclosed to Plaintiffs she found to be **"highly offensive."**

33.    Dr. McQuitty and Mr. Neil would regularly make comments about the fact that Ms. Lopez's husband was older than she was. On one occasion, in the lounge, in front of other employees, Mr. Neil said to Ms. Lopez, **"Maybe he [Ms. Lopez' husband] needs Viagra."** Dr. McQuitty then crudely remarked, **"Deb just needs two 20-year-olds [to have sex with]."**

34.    Ms. Christina Munns, another female employee at Small Smiles, told Ms. Lopez that she was talking to Dr. Takaki about Ms. Lopez' husband, Mr. Manuel Vigil, telling Dr. Takaki how

9

wonderful Mr. Vigil was. Dr. Takaki then interrupted Ms. Munns and inappropriately remarked, **"YOU deserve Manuel, not Debra."**

35.     Again, in August of 2005, in the office lounge, Dr. McQuitty asked Ms. Lopez, **"How much do your breasts weigh,"** and "**Is Manuel [her husband] impotent?"** He then looked at Ms. Gina Castro, another female employee who was present, and laughed. Then Dr. McQuitty began to talk about women's **"hymens,"** much to the disgust and discomfort of Ms. Lopez, Ms. Romero and Ms. Castro, who were all present.

36.     In the Summer of 2005, prior to Ms. Lopez's termination, Dr. McQuitty's mistreatment of Ms. Lopez worsened. In addition to constant sexual harassment, he became verbally abusive. One day, Ms. Lopez asked Dr. McQuitty how his week was. He rudely stated to her, **"None of your fucking business."**

37.     Ms. Lopez reported this offensive and unprofessional remark to Dr. Takaki. Dr. Takaki did speak with Dr. McQuitty about his inappropriate comment, yet, thereafter, Dr. McQuitty openly retaliated against Ms Lopez because she was an older woman who was constantly complaining about his sexually offensive behavior. He ultimately terminated her employment and replaced her with Jane Doe 2, a much younger female (early 20's), to whom he had been displaying sexual attraction.

38.     As with Ms. Lopez, Ms. Romero experienced constant and pervasive age and gender discrimination and sexual harassment, both directed at her personally and through her personal exposure to the sexual harassment and discriminatory mistreatment of other female employees in the clinic. Dr. McQuitty specifically singled out Ms. Romero for mistreatment because she was an older

10

woman (age 50) and because she openly disapproved of his sexual harassment and discrimination against other female staff.

39.     On one occasion, Ms. Romero was standing with another female employee, Jane Doe 3 (24 years old), in the front office of the clinic. Dr. McQuitty came up to Jane Doe 3 from behind and began rubbing his groin area against her buttocks. This was, of course, highly offensive to Ms. Romero.

40.     On another occasion, Ms. Romero observed Dr. McQuitty asking Ms. Munns (41 years of age) to touch his "muscles" on his thigh. After Ms. Munns reluctantly did so, Dr. McQuitty said, **"Higher! Above the knee!"** gesturing to Ms. Munns that she touch him in his groin area. Ms. Munns, of course, refused.

41.     Ms. Romero also observed Dr. McQuitty chasing Jane Doe 4 (early 20's) through the office hallway. **Dr. McQuitty grabbed Jane Doe 4 and began groping her body with his hands in a sexual manner, on her buttocks and on her waist.** Ms. Lopez also witnessed this extremely offensive behavior.

42.     On one occasion, Plaintiffs were forced to witness Dr. McQuitty showing off his belt buckle to Jane Doe 3 by sexually thrusting his groin upwards at Jane Doe 3 in Plaintiffs' presence. Jane Doe 3 said to Dr. McQuitty, **"Go ahead! Open it! Show it!," asking Dr. McQuitty to open his pants and show his penis.**

43.     Ms. Romero also was forced to observe Jane Doe 3 making offensive sexual gestures to Dr. McQuitty with her pen. Jane Doe 3 would insert the pen into her mouth and move it in and out, while looking at Dr. McQuitty, simulating the motions of performing fellatio on Dr. McQuitty.

11

Dr. McQuitty indicated that he was entranced with her salacious and inappropriate workplace behavior and encouraged her to continue. Ms. Lopez and Ms. Sandoval were also present during this encounter and found it to be highly offensive.

44.     On several occasions, Ms. Romero witnessed Jane Doe 3 creating pornographic images at the front desk where Ms. Romero worked. In August of 2005, Dr. McQuitty came up to Jane Doe 3 at the front office and picked up one of the images of a man made out of popsicle sticks with a penis and testicles. Jane Doe 3 said to Dr. McQuitty, "Stop trying to take my man!," and Dr. McQuitty sexually replied, **"I am your man!"**

45.     One day, Dr. Takaki and Ms. Romero discussed Ms. Romero's post-operation follow-up regarding her hand surgery, as she needed to have the stitches removed and her hand placed in a cast. Dr. Takaki told Ms. Romero that if she did not feel well following the procedure, not to come in to work that Friday. When Ms. Romero returned to work the following Tuesday, she received a reprimand and a write-up for missing work, even though three other employees were out of work that Monday and did not receive write-ups. This discipline was obviously applied because Dr. Takaki was retaliating against Ms. Romero for her recent complaints about Dr. McQuitty's sexually harassing behavior and the sexually hostile environment in the office.

46.     In September, 2005, Ms. Romero requested a transfer to Small Smiles' Albuquerque clinic to become its office manager. Thereafter, Sharon Ludi, Office Manager, told Ms. Romero that Jane Doe 3 had accepted a position at the Albuquerque clinic. Jane Doe 3 (age 24) was promoted to the position, even though Jane Doe 3 had no experience to qualify her for the position. Ms. Romero had far greater managerial experience, and Jane Doe 3 had been employed at Small

12

Smiles for less time than Ms. Romero. However, Ms. Romero was not given an opportunity to apply for this position. The Albuquerque position was intentionally kept a secret from Ms. Romero by Jane Doe 3, Dr. McQuitty and Dr. Takaki. Jane Doe 3 would talk about how she got the Albuquerque position and say, "Shhh! Nobody knows." Even Dr. DeRose knew Jane Doe 3 received the Albuquerque position. Dr. DeRose was in the Santa Fe office one day and remarked to Jane Doe 3, "Congratulations on your new position!" This was the first time Ms. Romero had heard about the position even being available.

47.     It was obvious to everyone that Jane Doe 3 was hired for the Albuquerque office manager position because she was younger than Ms. Romero and because Drs. Takaki and McQuitty were retaliating against Ms. Romero for, among other things, her complaints about the sexually hostile work atmosphere at the Santa Fe clinic.

48.     Prior to Ms. Romero's constructive termination from Small Smiles, Ms. Romero asked Dr. McQuitty and Dr. Takaki why she was not being promoted to office manager in the Albuquerque clinic. Dr. McQuitty replied to Ms. Romero, **"You will never fucking be office manager."** This crude remark confirmed that the refusal to transfer and promote Ms. Romero was in retaliation for complaints about Dr. McQuitty's and Dr. Takaki's illegal behavior. Ms. Romero complained to Dr. Takaki about this comment. Dr. Takaki stated, "Well, we'll write something up about your finding the behavior rude. Pat shouldn't talk like that." Thereafter, not only was nothing done about Dr. McQuitty's remark, but Dr. Takaki told Dr. McQuitty that Ms. Romero had complained about his comment. Thereafter, Dr. McQuitty began to retaliate against Ms. Romero for complaining. Another employee, Pam Baca, told Ms. Romero that Dr. McQuitty said "I'm not gonna give Kathy the satisfaction of getting fired. I'm gonna make life hell for her so she quits."

13

49.     Ms. Sandoval was also subjected to gender discrimination, both personally and as a result of her exposure to the sexually hostile and discriminatory mistreatment of other female employees at Small Smiles by Drs. Takaki and McQuitty.

50.     In March of 2004, Ms. Sandoval was diagnosed with Type II diabetes, a medical disability.  Ms. Sandoval was allegedly terminated for "excessive absences" taken in connection with her illness and its treatment.  However, the majority of these absences were actually excused by Dr. Takaki with written notes.   The real reason for Ms. Sandoval's termination was gender discrimination and illegal retaliation and because Ms. Sandoval suffered from a disability.

51.     Ms. Sandoval's termination also came after an incident involving another male employee, Mr. Zuhier Berkrouchir.  Mr. Berkrouchir was not from the United States.  After a few months at Small Smiles, Mr. Berkrouchir took the test to become a radiology technician and failed.  A few months later, he took the radiology test again and said that he had passed.  However, he provided no documentation to prove this.  Dr. Takaki curiously never asked for any documentation from Mr. Berkrouchir proving that he had passed the examination and allowed him to conduct x-rays for several months without producing the required documentation.  New Mexico law governing dental practices in this state required Mr. Berkrouchir to produce documentation reflecting that he had successfully passed the radiology examination, so, at the request of Dr. Ritchey, Ms. Sandoval called the Dental Board and found that Mr. Berkrouchir had, in fact, failed the second examination and was therefore not legally authorized nor qualified to perform x-rays on patients of the clinic.

52.     Ms. Sandoval disclosed this violation of the law to Dr. Ritchey, and Dr. Ritchey brought it to Dr. Takaki's attention, informing Dr. Takaki that they needed to immediately terminate

14

Mr. Berkrouchir's employment, because Dr. Ritchey did not want to jeopardize her license to practice dentistry.

53.     Mr. Berkrouchir was terminated, but shortly after his termination, Dr. Ritchey was also terminated in apparent retaliation for her complaint and also for voicing her discomfort with the sexually hostile work environment being experienced by all of the female employees.

54.     Ms. Sandoval was also terminated, and her termination was because of her participation in whistleblowing complaints lodged against Mr. Berkrouchir (see above), and later Dr. McQuitty (see below), because she was a woman and because she disapproved of Dr. McQuitty's and Mr. Neil's sexually offensive and hostile behavior committed in her presence and complained about it to Dr. Ritchey, her supervisor.

55.     Ms. Ulibarri was also subjected to gender discrimination and sexual harassment, both personally and as a result of her exposure to the sexually hostile mistreatment of other female employees at the Small Smiles clinic in Santa Fe by Dr. Takaki, Dr. McQuitty and Mr. Neil. Ms. Ulibarri was a minor at the time all such incidents occurred.

56.     One of the first comments made to Ms. Ulibarri by Dr. McQuitty when she was hired at the clinic was, **"Oh yeah! You're real cute! I think you're going to do great here!" Dr. McQuitty immediately placed his hand on her shoulder.** Shortly thereafter, Ms. Ulibarri overheard Jane Doe 4 say to Dr. McQuitty, **"You better watch out with this one [referring to Ms. Ulibarri]. She's not even 18!"** Dr. McQuitty and Jane Doe 4 then proceeded to laugh.

57.     In July, 2005, Ms. Ulibarri reported for work after a weekend trip, during which she had been badly sunburned on her shoulders, back and face. The sunburn caused her considerable

15

pain and discomfort.  Dr. McQuitty, however, found her sunburn amusing and said, **"Wow! Those burns on your chest look extremely painful!" Dr. McQuitty then proceeded to smack Ms. Ulibarri's burns on her chest with his hand, asking, "Did that hurt?"**

58.     Later that same day, Dr. McQuitty told Ms. Ulibarri that there was **"lotion with a marijuana leaf on it"** located in his office.  Dr. McQuitty said, **"It's very cooling and soothing and will help with burning.  You are welcome to use it."**

59.     Ms. Ulibarri then went into Dr. McQuitty's office to use the lotion he had recommended.  While she had the lotion in her hands, Dr. McQuitty walked into the office, shut the door behind him, applied lotion to his hands and said to Ms. Ulibarri, **"Here, why don't you let me help you with that."** Before Ms. Ulibarri could protest, **Dr. McQuitty came up behind Ms. Ulibarri, placed his hand over her shoulder and began to rub her chest.  Then Dr. McQuitty placed his hand under Ms. Ulibarri's bra and cupped her breast with his hand.**  Ms. Ulibarri was very nervous and afraid to move.  She felt she could not leave because Dr. McQuitty was blocking the exit to his office.

60.     Dr. McQuitty responded to Ms. Ulibarri's obvious display of fear by saying, **"You're getting nervous, I can tell.  Just calm down.  No one has to know about this."** Ms. Ulibarri turned away from Dr. McQuitty and responded, **"You're making me nervous and uncomfortable."**

61.     Dr. McQuitty then turned around, opened his office door and said, **"I'm sorry. I shouldn't have done that,"** admitting that he was fully aware that he had just criminally assaulted Ms. Ulibarri.

16

62.     When she left Dr. McQuitty's office after this incident, Ms. Ulibarri did not know what to do, as she was a new employee at Small Smiles and then only 17 years old. Ms. Ulibarri considered going to Dr. Takaki to make a sexual harassment complaint.   Ms. Ulibarri had been warned by other female employees that Dr. McQuitty was attracted to her and that she should stay away from him, so she felt guilty because the incident had occurred.

63.     Ms. Ulibarri had also been told that there had been previous complaints against Dr. McQuitty made by female employees, and they had been terminated as a result.  This made Ms. Ulibarri feel that if she complained about the assault, she would be fired.   No sexual harassment training of any kind had ever been provided to the female employees, and Ms. Ulibarri felt she had no choice but to remain silent.

64.     Ms. Ulibarri also remembered, upon first coming to Small Smiles, that Dr. McQuitty had taken her aside and told her, **"Oh yeah! If you get in good with the big boss [suggesting that she give him sexual attention], you'll have it made good [indicating that he would reward her for sexual favors]."**  She was afraid that if she complained about the assault, she would be terminated for not "getting in good with the big boss."

65.     Ms. Ulibarri was also very aware that Dr. McQuitty was having a relationship with Jane Doe 3, who never complained about his sexual advances.  Ms. Ulibarri witnessed Jane Doe 3 sitting on Dr. McQuitty's lap in his office, while Dr. McQuitty rubbed Jane Doe 3's shoulders.  On another occasion, Dr. McQuitty came up behind Jane Doe 3 and grabbed Jane Doe 3's breast in front of Ms. Ulibarri.  This was very offensive to Ms. Ulibarri, but, again, she felt she had no recourse but to remain silent.

17

66.    Dr. McQuitty would constantly make sexual remarks to Ms. Ulibarri regarding her physical appearance and how he found her to be sexually attractive. On Fridays, all employees, including Ms. Ulibarri, were permitted to wear jeans to work.  On one such Friday, Dr. McQuitty approached Ms. Ulibarri in the lab from behind and commented that he liked the design on the back pocket of her jeans. Dr. McQuitty remarked, **"Wow! I really like the design on your jeans," and placed his hand on her buttocks where the design was located.**  Again, Ms. Ulibarri was extremely frightened by his physically aggressive behavior and just moved away from him, clearly indicating that she was not interested in him sexually.

67.    Dr. McQuitty also told Ms. Ulibarri, **"Older men make better boyfriends and are great teachers,"** implying that older men were good at teaching young women about sex.

68.    On another occasion, Dr. McQuitty asked Ms. Ulibarri, **"Why are you so popular with the guys?,"** in a very derogatory tone. Ms. Ulibarri innocently replied, **"It's just my outgoing personality."** When these remarks were made, Ms. Ulibarri was sitting on a counter in the office with her legs dangling over the edge, in an uncrossed position. Dr. McQuitty then told her, **"Yeah, looks like you are *real* outgoing sitting like that [making sexual reference to her crotch area]."**

69.    On another occasion, Ms. Ulibarri was forced to endure Mr. Neil and Dr. McQuitty discussing their favorite sexual positions in her presence. Mr. Neil stated, **"Oh yeah, me and my wife like it [to have sex] in the shower.  I usually get her bent doggy style."** Dr. McQuitty laughed at this and turned to Ms. Ulibarri and asked her, **"What about you? Do you and your boyfriend do it in different positions? Do you like being kinky?"** Mr. Neil then commented while laughing, **"Cold shower! Cold shower!"**  **"Cold shower"** was a term Dr. McQuitty and Mr. Neil

18

would use to indicate that they were sexually aroused and needed a cold shower to prevent

them from getting erections. Dr. McQuitty and Mr. Neil would also often use the term "cold

shower" with other female employees or when young, attractive female patients would come into

the office. Additionally, another frequent and sexually offensive comment which was used by Mr.

Neil and Dr. McQuitty to explain that they were sexually aroused was, "I'm loaded," indicating they

were ready to ejaculate.

70.     On another occasion, in the presence of other employees, Dr. McQuitty

inappropriately asked Ms. Ulibarri, **"So, what's the oldest and what's the youngest you've**

**dated?"** When Ms. Ulibarri uncomfortably responded that she preferred dating older men because

younger men are too immature, Dr. McQuitty replied, **"Well, yeah, you need an older man 'cause**

**they're great teachers."**

71.     On another occasion, while Ms. Ulibarri was present, Dr. McQuitty was discussing

with Jane Doe 4 that Jane Doe 4's husband had a penis ring. Dr. McQuitty asked, **"Hey Jane Doe**

**4, does it make a difference in your pleasure?"** Jane Doe 4 replied, **"Shut up, no one is supposed**

**to hear that!"** Then Dr. McQuitty turned to Ms. Ulibarri and asked her, **"What about your**

**boyfriend? Does he have any piercings?"**

72.     In August 2005, before Ms. Ulibarri was fired, Dr. McQuitty asked Ms. Ulibarri,

**"How about you? Do you like sex in the shower?"** Ms. Ulibarri clearly communicated her

disinterest and discomfort with his advances by saying, **"I don't like all this sexual conversation."**

73.     Ms. Ulibarri then went to Dr. Ritchey, one of her supervisors, and told Dr. Ritchey

that she felt uncomfortable with the way Dr. McQuitty would make constant sexual comments to her.

19

Dr. Ritchey's only advice was, **"The best I can tell you is to stay away from him and ignore it."** This advice, coming from a female supervisor, made it clear that Ms. Ulibarri had no recourse concerning the sexual harassment perpetrated by Dr. McQuitty (and by Mr. Neil) and should not attempt to complain about their offensive behavior to anyone else.

74.     After Dr. McQuitty began to finally comprehend that his sexual advances towards Ms. Ulibarri were unwanted and that she was not interested in sexually responding to him, he began to retaliate against Ms. Ulibarri by changing his behavior toward her from sexual harassment and assault to anger and verbal abuse. It soon became clear that Dr. McQuitty wanted Ms. Ulibarri to leave Small Smiles and that he was determined to find a way to terminate her because she would not consent to have sex with him or otherwise respond positively to his sexual advances.

75.     Ms. Ulibarri complained to Dr. Takaki about some of the problems she was experiencing with Jane Doe 3, such as deferential treatment and favoritism exhibited toward Jane Doe 3 by Dr. McQuitty. For example, Ms. Ulibarri was being written up by Dr. Takaki for several things that Jane Doe 3 would do on a regular basis, yet Jane Doe 3 would not be disciplined by Dr. McQuitty because she was having sexual intercourse with him. Because Dr. Takaki knew Jane Doe 3 was having sexual intercourse with Dr. McQuitty, Dr. Takaki would not sympathize with Ms. Ulibarri's complaints and instead told her, **"Between you and Kathy [Romero] complaining about Jane Doe 3, it's all nonsense and needs to stop! Both of you need to take care of it yourself."** Dr. Takaki's statement made it clear that it was futile for female employees to complain about sexual harassment to a supervisor.

76.     Finally, Dr. McQuitty fabricated a "pretext" for terminating Ms. Ulibarri, that she had "misrepresented" that she had graduated from high school on her employment application, even though Dr. McQuitty knew that Ms. Ulibarri had, in fact, not graduated from high school long before he used this pretext to fire her.

77.     Approximately one month before Ms. Ulibarri was terminated, Dr. McQuitty mentioned in passing, **"You didn't really graduate from high school; you're just playing games!"** Later that day, Ms. Ulibarri approached Dr. McQuitty and asked him why he had made his earlier comment and if it had any significance. Dr. McQuitty replied, **"No, not at all. I was just giving you a hard time. Don't worry about it."** Ms. Ulibarri accordingly assumed that her failure to get a high school diploma was not an issue, especially because everyone, including Dr. McQuitty, knew she was only 17 years old when she began her employment with Small Smiles.

78.     During Ms. Ulibarri's employment interview, Ms. Ulibarri was never asked to provide any proof that she had received a high school diploma. Ms. Ulibarri never was told that the actual fact of graduating from high school was a prerequisite for employment at Small Smiles. Dr. Takaki never expressed any concern that Ms. Ulibarri was only 17 years old. Her employment interview was very brief, and Dr. Takaki was very impressed that Ms. Ulibarri had previous dental experience. Ms. Ulibarri was asked whether she could begin work the next morning following the interview, before she had even filled out an application.

79.     Ms. Ulibarri was never asked to complete her paperwork for FORBA for employment until four weeks after commencing work at Small Smiles, when the office manager, Ms. Sharon Ludi, told Ms. Ulibarri that they needed a "hire packet" from her because "corporate asked for it."

21

Ms. Ulibarri was then presented with a completed application and other paperwork and asked to sign. without being provided with any opportunity to review the documents either before or after she signed it. She was never provided with a copy of the documents, so she does not know how her high school graduation status was portrayed on them.

80.     Small Smiles terminated Ms. Ulibarri for "falsifying information" regarding graduation from high school, which was totally untrue. Her termination was actually in retaliation for her failure to acquiesce to Dr. McQuitty's sexual advances and for complaining about his preferential treatment of the female employee with whom he was having sex.

81.     Mr. Neil's outrageous, sexually lewd misconduct, directed towards Plaintiffs and other female employees at Small Smiles, was witnessed, condoned and ratified by Drs. Takaki and McQuitty.

82.     On one occasion, in the presence of several of the female staff, Mr. Neil was speaking with Ms. Ulibarri and asked her, **"Are you looking at my underwear?"** He then laughed and said, **"I'm going to rub myself [his penis] raw."** Mr. Neil then told Ms. Lopez, **"Anna's [Abeyta] just jealous because I'm hung like a horse.  Anna acts like a grandma and like she's never had sex."** Dr. Takaki learned about this incident from several members of the female staff, who complained to Dr. Takaki about Mr. Neil's sexually offensive remarks.  Dr. Takaki's only reprimand to Mr. Neil was, **"What's wrong with you?"**  Dr. Takaki did nothing else to deter Mr. Neil from continuing to act out in an inappropriate sexual manner toward the female members of the clinic's staff.

22

83.    **Mr. Neil constantly fondled his penis through his pants in front of the entire**

**female staff. Other patients of the clinic, mostly teenagers and children and their parents, also**

**had to witness Mr. Neil touch his penis.**

84.    One day, Mr. Neil was dancing in the front office, singing, **"I'm too sexy for my**

**body," in front of the clinic's patients while rubbing his nipples.**  Drs. McQuitty and Takaki

watched him and, instead of immediately curbing his offensive misbehavior, only laughed.

Thereafter, Dr. McQuitty found this behavior so amusing that he would also sing "I'm too sexy for

my body" while rubbing his nipples in front of his staff.

85.    On another occasion, Mr. Neil approached Ms. Ulibarri and **asked her to smell his**

**finger.**  Ms. Ulibarri replied, **"Ugh, what is that smell?"** and backed away from Mr. Neil.  Mr.

Neil replied, **"It's the sweat from my butt."**  Mr. Neil also did this to Ms. Lopez. On several

occasions, Mr. Neil would make Ms. Sandoval smell his underarm sweat that he had wiped on his

hands. Drs. Takaki and McQuitty were aware of this behavior, but Mr. Neil was never written up.

86.    Other comments made to and/or in the presence of female employees by Mr. Neil on

a frequent basis, in the presence and with the tacit consent of Dr. McQuitty and Dr. Takaki were:

**"My balls itch."**

**"My dick is so big."**

**"I have hair on my ass."**

**"I have rug burns on my knees."**[referring to his engagement in oral sex]

**"I make more money than most of you women."**

23

**"I got a bigger raise than most of you women."**

**"I like lying back with my wife's boobs in my face."**

**"Excuse the streaks in my shorts. I just can't help myself."**

Mr. Neil would also talk about his vasectomy and how his doctor told him how "large" his penis is.

87.     Drs. Takaki and McQuitty were present on many occasions when Mr. Neil would make the foregoing comments.  All Plaintiffs were present numerous times when these comments were made, yet nothing was done by Drs. Takaki and McQuitty to make Mr. Neil stop.  In fact, his behavior was encouraged by both doctors, as they openly found it very amusing.

88.     Dr. McQuitty and Mr. Neil would constantly make sexual gestures towards each other, in the presence of patients and Plaintiffs.  Dr. McQuitty and Mr. Neil would rub each other's nipples and point to their penises.

89.     Mr. Neil also made several comments about how he was treated better than the rest of the female staff.   Mr. Neil would state that he made more money than all of the female employees.  He also told Ms. Ulibarri, **"You wish you could make as much money as I could."** Mr. Neil would comment that he made more money than the women because he was Dr. Takaki's "favorite," and Dr. Takaki would take him to lunch daily.

90.     Dr. McQuitty flirted with all of the women in the office, especially the younger female employees, and he would even date them.  He enjoyed pitting them against each other, and, at one point, Dr. Ritchey mused with the older female staff, **"Why does Dr. Pat [McQuitty] play**

24

these games with the younger girls?  The worst part is that Dr. Mel [Takaki] allows this kind of behavior."

91.     Additionally, Dr. McQuitty and Mr. Neil would act out in a sexually inappropriate manner with their minor female patients. On one occasion, a 13 year-old girl came into the office for treatment. She was wearing loose shorts, and, while reclined in the dental chair, it was clear she was not wearing underwear. Mr. Neil noticed this and ran to Dr. McQuitty's office and yelled, "Come look! Come look! The girl in my chair's not wearing any underwear and you can see up her shorts!" Dr. McQuitty followed Mr. Neil in order to look up this young girl's pants. Dr. McQuitty then laughed and said, "For being so young, she sure has a bush [pubic hair]."

92.     Dr. McQuitty would constantly make comments to Plaintiffs concerning the young girls that would come into the office. On one occasion, Dr. McQuitty checked out one of the young patients in the office and said, "Good looking and has potential. She's got a nice little body."

93.     The following female employees were young women with whom Dr. McQuitty had consensual sexual interaction while they were working at Small Smiles, in full view of patients and other staff, including Plaintiffs:

**Jane Doe 1:**

Dr. McQuitty hired Jane Doe 1 who was in her early 20's.  After a few weeks, it became obvious he was dating Jane Doe 1. On one occasion, Dr. McQuitty was in his office with Jane Doe 1 with the door closed. After a lengthy period of time, they both exited Dr. McQuitty's office, and Dr. McQuitty, in full view of the female staff, had an obviously erect penis bulging through his pants, and they were both very disheveled-looking.  They had

25

obviously been engaging in sexual intercourse in his office.  Dr. Ritchey said, **"That's sexual harassment. Pat [McQuitty] is going to get in a lot of trouble."**

Jane Doe 1 was taking a smoking break one day and confided to Ms. Lopez, **"Dr. Pat doesn't allow me to have any relationship with any of the people at Small Smiles, or I can no longer date him."** On another day, Jane Doe 1 was taking a smoke break and told Ms. Romero that she was tired of Jane Doe 3 mistreating her because she was having an intimate relationship with Dr. McQuitty. Jane Doe 1 would also drive Dr. McQuitty's car to and from work.

### Jane Doe 2:

Jane Doe 2 (early 20's) was another female employee at Small Smiles. Within a short time of her hiring, it was apparent that Dr. McQuitty was sexually attracted to her.  Dr. McQuitty would croon to her in front of the other employees, **"Star light, Star bright. Won't you be my Star tonight?"** Dr. McQuitty was constantly making sexual comments to Jane Doe 2 and rubbing her back in the lounge area in front of other employees.  It is presently not known if Dr. McQuitty was having sexual intercourse with her.

After Dr. McQuitty began taking a sexual interest in Jane Doe 2, he demoted Ms. Lopez from the operating room, replacing her with Jane Doe 2, and moved Ms. Lopez back to hygiene, even though Jane Doe 2 had absolutely no experience in the operating room. Dr. McQuitty intended to replace Ms. Lopez with Jane Doe 2 and began to secretly train Jane Doe 2 for Ms. Lopez' position. This began several months prior to Ms. Lopez' termination.

**Jane Doe 3:**

In April of 2002, Jane Doe 3 (age 24) began working at Small Smiles. Dr. McQuitty began to date her, and this was made evident to all the employees at Small Smiles because Dr. McQuitty constantly made openly lewd sexual comments toward her, and he would constantly physically touch her in a sexual manner in the presence of other employees.

Jane Doe 3 was hired as a front office assistant, yet she had much less experience than Ms. Romero, Ms. Lopez or Ms. Sandoval. Dr. McQuitty immediately began an open affair with Jane Doe 3.  She first went with him to a concert, then she began wearing necklaces and rings to work that were owned by Dr. McQuitty.  Often, Dr. McQuitty and Jane Doe 3 would go into Dr. McQuitty's office during office hours and lock the door for prolonged periods of time. It was common knowledge they were having sex while in his office.  Plaintiffs were subjected to constant sexual innuendo, open sexual comments and observation of the sexual activities of Jane Doe 3 and Dr. McQuitty virtually on a daily basis. Often after performing lewd sexual gestures or making sexually suggestive comments to Jane Doe 3 in the presence of Plaintiffs and other female staff, Dr. McQuitty would laugh.  Dr. McQuitty took obvious pleasure in the fact that the rest of the female staff had to observe and endure his grossly inappropriate behavior with Jane Doe 3.

Dr. McQuitty would grab Jane Doe 3 and touch her in a sexual manner, on her buttocks, breasts and waist and make verbal sexual advances and lewd comments.  Dr. McQuitty would do this in front of the entire staff, including Plaintiffs.

27

For example, Dr. McQuitty asked Jane Doe 3 in front of the staff, including Plaintiffs, **"Do you swallow?"** Jane Doe 3 replied, **"I lick, I swirl and I don't drip."** Dr. McQuitty laughed loudly. Of course, this inappropriate sexual behavior was highly offensive to Plaintiffs.

On one occasion, Ms. Romero witnessed Dr. McQuitty throwing a pen into Jane Doe 3's shirt pocket and immediately grabbing it back out of her pocket, in order to touch her breast. Dr. McQuitty did this so Plaintiffs could clearly observe his conduct, because he thought it was "funny." It was, of course, degrading to Plaintiffs to watch Dr. McQuitty treat another woman with such disrespect and to flaunt his sexual perversion in their presence while they were working hard to perform their job duties for the benefit of his business.

Dr. McQuitty would refer to Jane Doe 3 on a daily basis as **"[Jane Doe 3] All,"** which was enunciated to sound like he was saying **"Eat it all,"** referring to her performance of oral intercourse upon him. Dr. McQuitty thought this was quite funny and would laugh after he would say this in the presence of the female employees at Small Smiles, including Plaintiffs.

In front of the entire office, Dr. McQuitty would often tell Jane Doe 3 to **"Open wide [so she could perform oral sex on him]."** She would play along and, in a sexually suggestive tone, ask, **"For what?"** All of the Plaintiffs were present on many of the occasions when Dr. McQuitty would play this sexually suggestive game with Jane Doe 3.

28

Dr. McQuitty performed dental services for several of Jane Doe 3's friends after hours. She would ask Dr. McQuitty, **while licking her lips, "What am I getting out of this?,"** implying that she wanted sexual or other favors in return.

Dr. Ritchey remarked to Plaintiffs one day, **"Look at how she [Jane Doe 3] struts around here,"** referring to how Jane Doe 3 openly flirted with Dr. McQuitty. **"She wants to make sure she's noticed. We should call Small Smiles the 'Dental Office Dating Game.'"**

Dr. McQuitty slapped Jane Doe 3 on her buttocks regularly. On one occasion, she replied, **"Stop it, you fag,"** and Dr. Ritchey said to the other female staff, **"Oh God! Not again!"**

On one occasion when Ms. Lopez was working on a young patient with Dr. McQuitty, Jane Doe 3 came into the room and whispered something in Dr. McQuitty's ear. Dr. McQuitty put his two fingers in Jane Doe 3's scrub shirt onto her nipple and rubbed them back and forth in front of the patient and in front of Ms. Lopez. Ms. Lopez asked Dr. McQuitty if she could remove the patient from the room, as Dr. McQuitty's behavior was extremely inappropriate. Dr. McQuitty responded to her request in a very rude tone, **"Take him out!"**

### Jane Doe 4:

Another of the female employees with whom Dr. McQuitty was believed to be engaging in sexual intercourse was Jane Doe 4 (early 20's). In front of the entire office staff, Dr. McQuitty would grab Jane Doe 4's buttocks, sit her on his lap, pick her up off the floor

29

and initiate sexual touching. This would occur on a regular basis, in front of all Plaintiffs. This was extremely offensive to Plaintiffs and the other female employees at Small Smiles, including Dr. Ritchey, Ms. Castro (mid 30's), Ms. Noel McCann (late 40's), Ms. Anna Abeyta (late 40's), Sharon Ludi (40's), Chris Munns (40's), Ms. Linda Ornelas (mid 40's) and Linda Mae Wilcox . Dr. McQuitty's sexual activities with Jane Doe 4 occurred in the kitchen, the lab, the operating room and in his office.

On one occasion, Jane Doe 4 was asked to help in "hygiene" with x-rays. Dr. McQuitty came up behind her, in front of Ms. Lopez and Ms. Sandoval and other female employees, and squeezed her sides with his hands and said, **"Oh, you look so cute!"** In reaction, Ms. Abeyta said, **"Here we go. It's 'Let's flirt with [Jane Doe 4] day.'"** Ms. Sandoval agreed, **"Isn't that every day?"**

On another occasion, Plaintiffs and the rest of the staff were in the lounge with Jane Doe 4. Dr. McQuitty entered the lounge and slapped Jane Doe 4 on her buttocks. This was the first time that she appeared upset by his actions, presumably because he surprised her in front of the entire staff. Ms. McCann commented that **"Dr. Pat shouldn't touch little [Jane Doe 4],"** attempting to convey to Dr. McQuitty how offensive it was for all of the female employees of the office to have to witness Dr. McQuitty treating a young woman with such disrespect. Dr. McQuitty then said, **"[Jane Doe 4], you would never sue me for sexual harassment."** This remark confirms that Dr. McQuitty was well aware that his actions were illegal.

In September of 2005, Dr. McQuitty again touched Jane Doe 4 inappropriately in front of Ms. Lopez and Ms. Abeyta. Jane Doe 4 felt uncomfortable with the touching and said to Dr. McQuitty, **"Knock it off!"** Ms. McCann then came into the room and told Dr. McQuitty and Jane Doe 4, **"Knock it off! Dr. Mel can hear you guys!"** Because of the size and layout of the office, Dr. Takaki was fully aware of Dr. McQuitty's constant sexual harassment of the younger female staff members.

94.     On one occasion, in the presence of Plaintiffs and the rest of the staff, Ms. Ulibarri made the mistake of saying that she was "tired of dating boys," to which Dr. McQuitty replied, **"You need a man."** Then Dr. McQuitty and Ms. Ulibarri exited the room. Dr. Ritchey told Plaintiffs, **"Dr. Pat [McQuitty] is digging himself a huge hole [referring to his sexual harassment of Ms. Ulibarri] and Dr. Mel [Takaki] does nothing."**

95.     Not only would Dr. McQuitty and Dr. Takaki flirt with the female employees and make inappropriate sexual comments, they would discuss the younger female patients that came into Small Smiles in a sexually degrading manner, in the presence of Plaintiffs. On one occasion, in the presence of Plaintiffs, Dr. McQuitty said to Dr. Takaki, **"Hey Mel, go look at Anna's patient. She's only 15. Too bad she's not 18!"** Both Dr. Takaki and Dr. McQuitty then laughed as if this comment degrading a young female patient was humorous. Dr. McQuitty's often-stated "motto" was, **"Eighteen is legal! Anything over 35, and she better have money!"**

96.     Additionally, Dr. McQuitty would attempt to discuss with the female staff the more attractive female patients that would come into the office, even if they were minors. On one occasion, Dr. McQuitty was staring at one of Ms. Linda Lou Ornelas' young patients. Dr. McQuitty

31

told Mr. Neil in front of all Plaintiffs, **"Did you see Linda's patient? I'd hit [have sex with] that!"** Mr. Neil then dramatically grabbed his chest and said, **"They were huge!,"** referring to the patient's large breast size. Dr. McQuitty then laughed and said, "**I love my job!**"

97.     Not only was Dr. McQuitty openly dating several of the female employees, he would also discuss their "outings" at work.   Dr. McQuitty, Jane Doe 4 and Ms. Madonna Serrano (early 30's) would often socialize together.  Ms. Pam Baca, a former employee, told Plaintiffs that she overheard Dr. McQuitty, Jane Doe 4 and Ms. Serrano discuss their use of cocaine, marijuana and ecstasy.

98.     Mr. Neil would draw obscene pictures of women with oversized breasts and show them to Dr. Takaki, Dr. McQuitty, Plaintiffs and the rest of the female staff.  Mr. Neil was never disciplined for this behavior.   In fact, Dr. Takaki and Dr. McQuitty found his deviant sexual behavior amusing.

99.     In September of 2005, Dr. McQuitty was in the office lounge and began telling Ms. Romero, Ms. Lopez and other female staff members about how **"in foreign countries, a doctor can repair the hymen of a woman to restore her to a virgin."** When Ms. Gina Castro said, **"I didn't bleed 'till after the third time [she had sex],"** Dr. McQuitty replied, **"Well, maybe he wasn't doing it in the right place."**

100.     The illegal misconduct of Defendants includes gender and age discrimination: The younger female employees who were in their early 20's were treated differently than the female employees who were in their 40's. The younger females were treated better, received better work hours, less duties, more time off, more breaks and more freedom to do what they pleased during

working hours. The three with whom Dr. McQuitty was having sexual affairs were especially treated differently.    Any woman over 40 who worked at Small Smiles was disparaged, degraded, embarrassed, ridiculed and otherwise subjected to disparate and hostile treatment by her supervisors, Drs. Takaki and McQuitty, and by Mr. Neil, their co-worker, which mistreatment was so pervasive that it significantly and adversely affected the terms and conditions of their employment, causing them to endure a hostile work environment, suffer severe and extreme emotional distress and ultimately result in the termination of their employment.

101.    In August of 2005, Ms. Romero went to the back of the office and overheard Dr. McQuitty talking to Ms. Ulibarri, in whom Dr. McQuitty had a sexual interest. Dr. McQuitty said to Ms. Ulibarri, **"To move up and get ahead in this clinic, you have to be friends with the boss!"** Ms. Romero reported this discriminatory comment to Dr. Ritchey, the only female doctor in the clinic, but, of course, nothing was done, nor was any training provided regarding illegal workplace behavior, its reporting and/or remediation.  Additionally, Small Smiles did not have any of their employees sign their sexual harassment policy until September 22, 2005. They were handed the policy and were required to sign it. This was the extent of any sexual harassment policy discussion at Small Smiles.

102.    Prior to an office meeting, Dr. McQuitty and Mr. Neil were talking about the various ages of the female employees at Small Smiles, in front of the entire staff, including all Plaintiffs. Mr. Neil laughed and said, **"We need new, fresh, pretty, young women here at work."** Dr. McQuitty responded, **"What, you don't like dried-up old prunes?"** Mr. Neil then remarked to all of the staff, **"And that's why Dr. Pat is my hero."**  Dr. Takaki was present during this entire interaction and only laughed, indicating that he shared this discriminatory and demeaning attitude.

33

103.    On another occasion, Dr. McQuitty and Mr. Neil were throwing things at each other across the room in the office. A ball of paper hit Ms. Lopez in the head, and Mr. Neil yelled, **"See Deb, if you weren't so old, you could move faster. Don't be mad because you're old enough to be my mom."** Ms. Anna Abeyta told Mr. Neil to stop making such remarks, to which Mr. Neil replied, **"Anna, you're old enough to be my grandma."** Ms. Sandoval told Mr. Neil, **"You're cold-blooded."** Dr. McQuitty did nothing to stop Mr. Neil from berating his employees and just sat there laughing.

104.    After this encounter, Ms. Lopez complained to Dr. Takaki about the incident. Of course, Dr. Takaki defended Mr. Neil and said, **"You know, you have nothing when it comes to Josh and anything you say can be cancelled out. Just remember, he has stuff on you, too."** Ms. Lopez asked Dr. Takaki to what he was referring, but Dr. Takaki did not provide her with an answer.

105.    In October of 2005, Dr. Takaki yelled at Plaintiffs, **"You women are so stupid! Why get married if your husbands can't take care of you?"**

106.    On the other hand, Dr. Takaki and Dr. McQuitty treated Mr. Neil differently in virtually every respect.

107.    For example, Dr. Takaki would take Mr. Neil out to lunch every week, yet he would rarely take any of the female employees out to lunch.

108.    Mr. Neil would often not perform his duties while he was in the office. Instead, he would spend his time in Dr. McQuitty's office on the computer or in the closet on his cell phone. Mr. Neil was allowed to use Dr. McQuitty's office and computer for his personal use whenever he wanted. This was brought up to Dr. Takaki, but nothing was done. In August of 2005, Ms. Lopez

34

asked Dr. McQuitty, **"Where is Josh off to now?"** Dr. McQuitty angrily replied, **"I run the [fucking] show around here! If any of you don't like it, too fuckin' bad!"** Ms. Romero and Ms. Abeyta also overheard this remark.

109.    The female staff would often discuss the fact that Mr. Neil would be treated differently than the women in the office. On one occasion, Ms. McCann stated, **"Yeah, Dr. Mel would just laugh [when one of the women complained] and take Josh to lunch."** Additionally, Mr. Neil would take free time whenever he desired or in order to "hang out" with Dr. McQuitty in his office, because they were "buddies."

110.    Even the office manager, Ms. Sharon Ludi, acknowledged in a discussion regarding the deferential treatment of Mr. Neil by Dr. Takaki and Dr. McQuitty, **"The men in the clinic stick together."**

111.    On another occasion, Mr. Neil was at the front desk with a rolled-up paper towel pretending to smoke a marijuana cigarette. Ms. Ludi told Mr. Neil, **"We have patients in the lobby."** Instead of responding to her reprimand, Mr. Neil went to Dr. Takaki and passed him the fake "joint." Dr. Takaki only laughed.

112.    Mr. Neil would constantly play practical jokes on the female employees in the office. These jokes were not welcomed by the female staff, and this was made known both to Mr. Neil and to Dr. Takaki. Dr. Takaki never reprimanded Mr. Neil for his actions, despite many complaints from Plaintiffs about Mr. Neil's behavior. Not once was Mr. Neil disciplined for his mistreatment of female staff. However, Ms. Romero was disciplined on several occasions for conduct actually engaged in by Mr. Neil.

35

113.   Mr. Neil told Ms. Abeyta, in the presence of Plaintiffs, **"Only poor people live in trailers."** Ms. Sandoval said, **"I live in a mobile home."** Mr. Neil then told Ms. Abeyta, **"Shut up, grandma."** Ms. Abeyta reported this harassment of Ms. Sandoval to Dr. Takaki, but, as usual, nothing was done. On another occasion, Ms. Abeyta told Mr. Neil and Ms. Ulibarri that they needed to stop taking a break and work. Mr. Neil told Ms. Abeyta, **"Whatever, Grandma."** Ms. Abeyta again complained about this mistreatment to Dr. Takaki, and, again, nothing was done.

114.   On one occasion, Mr. Neil approached Ms. Lopez and told her, **"Don't move around so much because when [your boobs] jiggle, it makes me think of my wife."** In fact, on one occasion, when Ms. Lopez complained to Dr. Takaki regarding Mr. Neil's offensive sexual comments, Ms. Lopez told Dr. Takaki, **"You need to do something about this, or I will file a complaint."** Instead of taking action against Mr. Neil for his illegal behavior, Dr. Takaki enigmatically told Ms. Lopez, **"Well, Josh has things on you, too."** This demonstrates that Dr. Takaki knew about and condoned the sexually harassing and discriminating behavior being perpetrated in the office.

115.   Ms. Serrano complained to Dr. McQuitty in September of 2005 regarding how he treated Mr. Neil differently than the women in the office. Dr. McQuitty responded defensively, **"You guys need to worry about yourselves. I run the show."** Ms. Sandoval and Ms. Lopez overheard this exchange and understood that any complaint regarding the pervasive and hostile sexual harassment and discrimination in the office would be futile.

116.   Dr. Ritchey disclosed to Ms. Lopez and Ms. Sandoval that Dr. McQuitty would leave his pay stubs on his desk so that Dr. Ritchey would see them and know that Dr. McQuitty made more

36

money than she was making for the same work.  Dr. Ritchey also told Ms. Romero that she [Dr. Ritchey] was very upset that Dr. McQuitty made more money than she did, even though they were equally qualified and were doing identical work.  This disparate treatment of a professional woman is evidence of the discriminatory intent that also pervades the corporate office and likely extends to all of FORBA's clinics around the country.

117.    One day, Mr. Neil stated to the staff, **"Who is the oldest grandma in here? Anna, Debra, Noel, Linda Mae? Oh yeah, Linda Mae doesn't count."** Ms. Lopez complained to him, **"You are always talking age."** Dr. Ritchey then intervened and told Mr. Neil, **"That's enough!,"** but Mr. Neil was undeterred because his behavior was condoned and ratified by Drs. Takaki and McQuitty.

118.    After this incident, Ms. Lopez again went to Dr. Takaki to report Mr. Neil's and Dr. McQuitty's illegal and hostile workplace behavior.  Ms. Lopez told Dr. Takaki that she did not like Dr. McQuitty's and Mr. Neil's sexual jokes and their references to Plaintiffs as "grandmas" and Mr. Neil's remarks that he made more money than the rest of the female employees.  Later that day, both Ms. Lopez and Mr. Neil were called in to Dr. Takaki's office.  Dr. Takaki told them, **"You have both been here a long time. Set an example for others. I don't want anymore fighting."** No investigation of Mr. Neil's behavior was conducted, nor was he disciplined in any manner for his misconduct that was clearly inappropriate and illegal.

119.    One morning in July of 2005, Ms. Romero walked through the lab, and Dr. McQuitty and Mr. Neil began to laugh at her.  They commented about Ms. Romero's **"flat ass"** and how

37

"these older women are spreading for the worst." Dr. McQuitty then said, "That's nothing! Some of them are really gapped! [referring to a larger space between their legs]."

120.    Dr. McQuitty and Mr. Neil conspired to remove Ms. Lopez from her job in the operating room because she was an older woman and because she was complaining about the hostile work environment they were perpetrating.

121.    Ms. Lopez overheard Mr. Neil tell Jane Doe 2, "Learn as much as you can so we can move you in and Debra out." Later, Ms. Sandoval heard Dr. McQuitty speaking to Jane Doe 2 stating, "There will be some changes," and that he wanted her in "OPS" (the operating room).

122.    In September of 2005, without any prior warning given to Ms. Lopez, Dr. McQuitty told Ms. Serrano, "Clean and stock so Jane Doe 2 can move into OPS," in order to take over Ms. Lopez' position. Ms. Lopez was not told of this change nor why the change was taking place. Mr. Neil then made a comment to Ms. Lopez in the presence of Dr. McQuitty, "Watch out, or we will give Jane Doe 2 your locker, too." Dr. McQuitty and Mr. Neil then laughed in Ms. Lopez's face.

123.    There was also a conspiracy to have Ms. Romero and Ms. Lopez terminated because of their age and because they were constantly complaining about the sexually hostile work environment.

124.    Dr. McQuitty, Dr. Takaki and Mr. Neil engaged in other illegal misconduct: Such misconduct was in violation of OSHA, the Dental Assisting Rules of the Board of Dental Health Care and related statutes.

125.    Dr. McQuitty and Jane Doe 3 intentionally put NoDoz (a highly caffeinated substance) in the employee coffee pot, without the female employees' knowledge. NoDoz is a

substance that creates a feeling of having 20 or 30 times the amount of caffeine that is normally in coffee. Many people have severe reactions to the substance and become violently ill. After unknowingly ingesting the substance, Ms. Lopez and Ms. Romero proceeded to become extremely ill. Ms. Lopez became so ill, she began to vomit from the NoDoz.

126.    They learned the cause of their illness when Dr. McQuitty and Jane Doe 3 told them they had ingested NoDoz. Dr. McQuitty admitted that he intentionally placed NoDoz in the coffee because **"I thought it was funny."** Dr. McQuitty and Jane Doe 3 both laughed at Plaintiffs after they had become sick, saying, **"Maybe now you'll work faster."** This act constitutes a battery upon Ms. Lopez and Ms. Romero, accomplished recklessly and/or intentionally, knowing that these Plaintiffs would likely suffer physical harm.

127.    One day, Dr. McQuitty came into the office, acting strangely, and told Jane Doe 4, **"Shit man, I've been up since 4 am; I never made it home."** Dr. McQuitty was clearly under the influence of a controlled substance. Dr. Ritchey commented, **"I wouldn't want him working on my kid like that."** While still under the influence, Dr. McQuitty asked Jane Doe 4, **"Can I smell your hair?"** Ms. McCann said, **"What the hell is he on?"** Dr. Ritchey then remarked, **"Everyone should have random drug testing."** The entire staff was concerned that Dr. McQuitty was working on patients while under the influence of drugs. Dr. Takaki overheard the entire encounter and witnessed Dr. McQuitty's bizarre behavior but said nothing and took no action to protect the clinic's patients.

128.    Additionally, it was common knowledge that Dr. McQuitty would stay after hours, often all night at Small Smiles, and hook himself up to the Nitrous Oxide that was used on patients. He did this in order to **"get high"** from the substance.

129.    On one occasion, Dr. McQuitty commented in the presence of Ms. Ulibarri and other employees, **"Oh yeah, I've snorted more cocaine and tripped on more acid than a lot of people can handle."**

130.    Drs. Takaki and McQuitty were both present when Mr. Neil refused to work on children with special needs. Mr. Neil said to Dr. Takaki, **"Debra likes the little retarded kids. Let her do it."** Mr. Neil was never disciplined for this unprofessional behavior. In fact, Drs. Takaki and McQuitty found this disparagement of their disabled young patients amusing.

131.    Additionally, Dr. McQuitty and Mr. Neil would make fun of their child clients from Mexico. They would refer to them as "squash heads" and say to them, "Mira tu Rozca Negra," which means "Look at your black ass" in Spanish.

132.    OSHA regulations have been consistently ignored and/or intentionally violated. For example, Drs. Takaki and McQuitty allowed Ms. Ulibarri and Mr. Zach Berkrouchir, another employee, to operate the x-ray machine, even though both of them were not licensed to do so. In fact, Small Smiles was fined for this practice. Additionally, Jane Doe 3 was allowed to duplicate x-rays without being radiograph-certified.

133.    OSHA regulations were not being followed in the lab. For example, the instruments were not being properly sterilized between usages and were not being packages according to OSHA guidelines. The lack of correct sterilization of the dental blocks was particularly alarming to

40

Plaintiffs. According to guidelines, Dental blocks are to be soaked in a sanitizing solution for 24-48 hours prior to reuse. Often the dental blocks at Small Smiles would be put in the sanitizing fluid and then immediately taken out again, being used up to several times per day. Several of the employees complained about this practice to Dr. Takaki and Dr. McQuitty. However, this unsanitary and unsafe practice was not remedied.

134. Additionally, all nondisposable contaminated materials were to be kept in a biohazard container. This practice was never followed at Small Smiles. Small Smiles used blue cloths to lay across patients to keep blood and other materials from contaminating the patients' clothes. After their use, the blue cloths were not kept in a biohazard container, but instead were kept in an old laundry basket lined with a black trash bag that was never changed. Many employees complained about this practice, but nothing was ever done to remedy the situation.

135. Ms. Sandoval, Ms. Lopez and Linda Lou Ornelas contracted a severe case of ringworm from three patients at Small Smiles. Dr. Takaki was made aware that these three children had ringworm before the patients were treated by Ms. Sandoval, Ms. Lopez and Ms. Ornelas; however, Dr. Takaki instructed them to treat the patients anyway. Because Dr. Takaki had no regard for their physical well-being, Ms Sandoval, Ms. Lopez and Ms. Ornelas all contracted ringworm.

136. Additionally, Small Smiles employees were forced to work on patients with lice, including Ms. Lopez.

137. Additionally, Dr. McQuitty would allow Jane Doe 4 to suction mucous out of young patients' noses with the same suction straw that was also used to suction patients' mouths.

41

138. **Dr. McQuitty would allow Jane Does 4 and 5 to make prescriptions for the patients, even though they were not hygienists and therefore not authorized to make prescriptions.**

139.    In July of 2005, Ms. Sandoval was assisting Dr. McQuitty, as Ms. Serrano, his usual assistant, was gone for the day. Dr. McQuitty's patient was a young child who was crying and screaming. Dr. McQuitty began yelling in the child's ear, **"Stop crying!"** Dr. McQuitty then placed his hand over the child's mouth and nose. The child gasped for air, and when Dr. McQuitty finally removed his hand, the child let out a piercing scream. Dr. McQuitty had obviously put the child in great fear for his personal safety.

140.    On another occasion, Ms. Sandoval witnessed Dr. McQuitty inserting his fingers down the child's throat to the back of his tongue, applying strong pressure, in order to get the child to stop crying. The child began to gag. Then Dr. McQuitty paused for a moment, and once again placed his fingers in the back of the child's throat. Jane Doe 4 was also in the room during this violent encounter. Ms. Sandoval was so concerned for the distress of the child that she began to cry. Then Dr. McQuitty left the room, frustrated that he had been unable to silence the child. Ms. Sandoval was so upset by this physical and emotional child abuse that she had to leave work immediately and drive home.

141.    The next day, Ms. Sandoval was still severely emotionally distressed and traumatized by Dr. McQuitty's criminal assault on this child. She called into work and was told by Mr. Neil that Dr. Takaki wanted to speak to her about the incident.

142.    When she arrived at work, Dr. Takaki called Ms. Sandoval into his office where Dr. McQuitty was already present.  Dr. Takaki already knew the issue, because Mr. Neil had told him that Ms. Sandoval was upset by what had happened.  Dr. Takaki obviously had Dr. McQuitty attend the meeting in order to intimidate Ms. Sandoval and to keep her from complaining about the incident outside of the office.  Dr. Takaki said, **"So, you have something to tell me?"**  Ms. Sandoval told Dr. Takaki what had happened and that Dr. McQuitty's actions toward the child were not acceptable. Dr. McQuitty then told Ms. Sandoval that he was **"taught a different technique"** in dental school, and unbelievably, Dr. Takaki agreed with him.  It was clear that both men were intent on covering up the incident and were bent on discouraging Ms. Sandoval from going to the authorities.  They succeeded, as Ms. Sandoval was fearful that she would lose her job if she said anything outside of the office.  Thereafter, Ms. Sandoval was removed from all assignments with Dr. McQuitty. This disparate mistreatment of Ms. Sandoval was also perpetrated by these men because she was a Hispanic woman whom they felt they could coerce into silence.

143.    On more than one occasion, Ms. Ulibarri witnessed Dr. McQuitty putting his thumb on a young patient's tongue and pressing down hard into the back of the child's throat, **"in order to stop them from screaming."**  Ms. Ulibarri protested by saying, **"But then they can't breathe."** Dr. McQuitty replied, **"If they stop screaming, they can breathe through their nose."**  Dr. McQuitty would also hit the children on their hands when they were not doing what he wanted them to do.

144.    Often Plaintiffs would assist in holding the children when Dr. McQuitty was working on them.  Dr. McQuitty would push the children's heads violently into the chest of whoever was assisting him.  On one occasion, Dr. McQuitty pushed the child's head so hard into Ms. Ulibarri's

chest that Ms. Ulibarri suffered blood blisters on her chest from where the child's head pressed into the heart locket she was wearing. When Ms. Lopez assisted Dr. McQuitty with this task and she would complain how hard he was pushing the child's head into her chest, Dr. McQuitty would laugh and say, "Oh look how Deb's boobs are spreading out" from the pressure of the child's head against Ms. Lopez' chest.

145.    On another occasion, Mr. Neil slammed one of the child clients into the wall after the child kicked Mr. Neil in the groin area. Ms. Sandoval and Ms. Lopez had to witness this abuse that was condoned by Drs. McQuitty and Takaki.

146.    On another occasion, Ms. Ulibarri witnessed Dr. McQuitty's further abuse. Whenever a child would complain that he was not numb enough and could "still feel it" Dr. McQuitty would stick an explorer (a very sharp dental device) deep into the roof of the child's mouth, in order to prove the child was numb enough, and ask, "Can you feel that?" When the child would say "No" then Dr. McQuitty would rip the explorer out of the child's gums.

147.    Dr. McQuitty would ask the children highly inappropriate questions when he was sexually attracted to their mothers. Dr. McQuitty would say, **"So what's your mom's name?" "Who's her boyfriend?" "Does he have lots of money or does he spend your mom's money?" "Do I have a chance with your mom?" "She's good looking! Tell your mother I told her to come for a visit."**

148.    When Dr. McQuitty was initially hired, he was not licensed to take out wisdom teeth. However, Dr. McQuitty did take out many patients' wisdom teeth.

149.    The above-mentioned unprofessional behavior was not confined to the Santa Fe Small Smiles clinic; it was also prevalent in the Albuquerque clinic, possibly indicating a nationwide pattern and certainly indicating the failure of FORBA to supervise and regulate the professionalism of its clinics. Ms. Romero's daughter briefly interned in the Albuquerque clinic and witnessed similar unprofessional behavior there. For example, Dr. Meyers, one of the Doctors of the Albuquerque clinic, would throw his dental instruments at Ms. Romero's daughter and scream at her until she was to the point of tears. This encounter was so violent for Ms. Romero's daughter that she no longer desired to pursue a career in the dental field.

150.    Ms. Lopez also worked briefly in the Albuquerque clinic and witnessed Dr. Meyers pick up a young patient by the mouth and neck while the child screamed and gasped for breath. Dr. Meyers would frequently yell at the young patients when they would cry.

151.    Even Mr. Neil expressed concern regarding Dr. McQuitty's mistreatment of young patients of Small Smiles. Mr. Neil was so concerned, even though Dr. McQuitty was his "buddy," that Mr. Neil reported his concerns to Dr. Takaki who, of course, did nothing. Dr. Ritchey was also quite concerned about the illegal misconduct occurring at Small Smiles and would say to Ms Lopez, **"Oh my God! This is a time bomb waiting to happen. The drugs, the drinking, the young girls ...."**

152.    Lodging complaints with Dr. DeRose at FORBA's corporate office in Pueblo, Colorado, was prohibited.

153.    In February of 2003, Ms. Romero complained to Dr. DeRose about an administrative issue in the Santa Fe clinic. After Ms. Romero complained, Dr. DeRose apparently immediately

45

informed Dr Takaki who then told the entire staff, **"If any of you go to Dr. Eddie with any complaints again, I'll fire you!"** As a result, all Plaintiffs were afraid to report the constant incidents of illegal activity and unlawful discrimination for fear of being terminated.

154.    Dr. DeRose also personally engaged in and condoned Dr. McQuitty's sexual harassment and sexually offensive conduct. On one occasion, Dr. DeRose was in the Santa Fe Small Smiles clinic for a meeting. Dr. McQuitty's sexual misconduct was mentioned, and Dr. DeRose said, in front of all the staff, **"Oh, you know how Dr. Pat is, messing around with the young girls!"** This statement by the owner/operator of FORBA demonstrates that the corporate office was aware of the sexual harassment that was being perpetrated at the Santa Fe office, yet made a deliberate decision to do nothing to stop it.

155.    When Dr. DeRose would come into the Santa Fe clinic, he would flirt with the female employees, including Ms. Lopez. Dr. DeRose would lick his lips and give Ms. Lopez a kiss on the cheek and tell her, **"Come here, big girl, and give me a hug."** Ms. Lopez clearly expressed her discomfort with this crude sexual behavior.

156.    Dr. DeRose would also rub his chest from side to side against Linda Mae Wilcox's breasts and Ms. Lopez's breasts when he would come into the office and "hug" them against their will.

157.    Ms. Lopez was terminated for allegedly utilizing all of her "personal time off" allocated to her. This was clearly a retaliatory pretext manufactured by Dr. DeRose and/or Drs. Takaki and McQuitty, as Dr. Takaki had personally signed off on all Ms. Lopez' attendance notification forms.   Dr. Takaki later told Ms. Lopez she had used up her 120-hour limit of

46

unexcused absences.   This was totally untrue, as Ms. Lopez came nowhere near to using up that many hours, and, in any event, all hours of sick leave taken by Ms. Lopez were agreed to by Dr. Takaki. The real reason for her termination was because she had constantly complained about the rampant sexual harassment occurring in the clinic.

158.    Ms. Sandoval was likewise retaliated against and wrongfully discharged for making protected complaints concerning illegal discrimination. Once Ms. Sandoval complained about Dr. McQuitty's treatment of their young patients, Dr. McQuitty was notified that Ms. Sandoval had lodged a complaint against him. From that point forward, Dr. McQuitty retaliated against Ms. Sandoval and worked to remove her from the office. Additionally, Dr. McQuitty would no longer check on her patients and Ms. Sandoval would often have to wait over an hour for one of the other Doctors to check her patients. This continued until her termination.

159.    Ms. Romero was also retaliated against for complaining about the pervasive sexual harassment and discrimination, and she was forced to resign her employment because she could no longer tolerate the hostile working environment created by Drs. Takaki and McQuitty, which was condoned by the corporate office, and the escalating retaliation directed at her personally.

160.    Ms. Ulibarri was also retaliated against for making protected complaints concerning illegal gender discrimination and sexual harassment, which retaliation culminated in her wrongful termination.

161.    Plaintiffs' lives have drastically changed since their termination, and all of them have suffered significant income losses.  They have had difficulty finding comparable employment.  They have all listed Small Smiles as a reference and believe that Drs. McQuitty and Takaki are

47

deliberately providing false and damaging information to prospective employers in order to thwart their efforts to find suitable employment. Ms. Sandoval has found work, but she no longer receives benefits, which has a adverse impact on her ability to get the medication she requires for her diabetes. Ms. Lopez and Ms. Romero have recently found work in retail making significantly less than at Small Smiles. Ms. Romero does not know if she will be able to continue such work, as it involves manual labor, which she is incapable of maintaining due to injuries sustained in a motor vehicle collision.    Additionally, Ms. Ulibarri attempted to file for unemployment after her termination , as being pregnant made it very difficult for her to find another job. Her unemployment was denied as Small Smiles refused to pay unemployment because "Ms. Ulibarri was not terminated," but instead left of her own volition. This is yet another fraudulent act perpetrated by Small Smiles.

162.    Ms. Romero was so affected by the trauma of the constant harassment and mistreatment that she was prescribed Paxil for anxiety. Ms. Romero dreaded going to work and would break into tears every evening after she arrived home as a direct result of the mistreatment she was enduring.

163.    The Human Rights Division of the New Mexico Department of Labor ("HRD") and the federal Equal Employment Opportunity Commission ("EEOC") have issued Right to Sue letters for all Plaintiffs.

## COUNT I
### Title VII of the Civil Rights Act - Sexual Discrimination/Harassment

164.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 163 above as if fully set forth herein.

48

165.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e2(a)(1), *et seq.*, declares that it is an unlawful employment practice for any employer to discriminate against an employee in the terms and conditions of her employment because of her sex.

166.    The aforementioned actions and inactions of FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees constitute unlawful sexual harassment and discrimination, creating a hostile and discriminating work environment in violation of Title VII, thereby entitling Plaintiffs to compensatory and punitive damages and attorneys' fees.

167.    As a direct result of the aforesaid misconduct of Defendants FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees, Plaintiffs have suffered and will continue to suffer severe emotional distress, embarrassment, humiliation, emotional distress and loss of employment and other economic damages.  Further, as a direct result of the aforesaid misconduct perpetrated by these Defendants, Plaintiffs have been prevented from performing their normal daily activities and obtaining the full enjoyment of life and have sustained loss of earnings and will continue to incur loss of earnings and other related damages.

168.    The misconduct of Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Plaintiffs' rights and feelings, knowing that their actions or inactions would cause Plaintiffs to suffer emotional distress and economic loss.

WHEREFORE, on Count I, Plaintiffs request that judgment be entered against Defendants, FORBA LLC, d/b/a Small Smiles, Inc., jointly and severally, awarding Plaintiffs compensatory and

49

punitive damages, together with pre-judgment interest, post-judgment interest, costs and attorneys' fees and such further relief as the Court deems proper.

## COUNT II

### New Mexico Human Rights Act – Sexual Discrimination/Harassment

169.   Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 168 above as if fully set forth herein.

170.   The New Mexico Human Rights Act, NMSA §28-1-7, *et seq.*, makes it an unlawful and discriminatory practice for an employer to discriminate in the terms and conditions or privileges of employment because of a person's sex.

171.   Defendants, FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees, therefore had a statutory duty not to discriminate against Plaintiffs because Plaintiffs are female.

172.   Defendants, FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees, violated this duty, as well as NMSA 1978, §28-1-7, et seq., by their aforementioned actions and inactions and by Defendants' creation and perpetuation of a hostile and sexually discriminating work environment.

173.   As a direct result of the aforesaid misconduct by these Defendants, Plaintiffs have suffered and will continue to suffer embarrassment, humiliation, emotional distress,  loss of employment and other economic damages.  Further, as a direct result of the aforesaid conduct of these Defendants, Plaintiffs have been prevented from performing their normal daily activities and obtaining the full enjoyment of life and have sustained loss of earnings and will continue to incur loss of earnings and other related damages.

174.    The misconduct of Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Plaintiffs' rights and feelings, knowing that their actions or inactions would cause Plaintiffs to suffer emotional distress and economic loss.

WHEREFORE, on Count II, Plaintiffs request that judgment be entered against Defendants, FORBA LLC, d/b/a Small Smiles, Inc., jointly and severally, awarding Plaintiffs compensatory and punitive damages, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such further relief as the Court deems proper.

**COUNT III**

**Debra Lopez and Kathy Romero**

**Age Discrimination in Employment Act of 1967 - Age Discrimination**

175.    Ms. Romero and Ms. Lopez hereby incorporate and re-allege Paragraphs 1 through 175 above as if fully set forth herein.

176.    The Age Discrimination in Employment Act of 1967, 29 USC § 621, *et seq.*, makes it an unlawful and discriminatory practice for an employer to discriminate in the terms and conditions or privileges of employment because a person is over 40 years of age.

177.    Defendants, FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees, had a duty by law not to discriminate against Ms. Lopez and Ms. Romero because Plaintiffs are over the age of 40.

178.    Defendants violated this duty, as well as by its aforementioned actions and inaction and by Defendants' actions in creating and perpetuating an age-discriminating work environment.

51

179.    As a direct result of the aforesaid conduct by these Defendants, Ms. Lopez and Ms. Romero have suffered and will continue to suffer embarrassment, humiliation, emotional distress, loss of employment and other damages.  Further, as a direct result of the aforesaid conduct of these Defendants, Ms. Lopez and Ms. Romero have been prevented from performing their normal daily activities and obtaining the full enjoyment of life and have sustained loss of earnings and will continue to incur loss of earnings other related damages.

180.    The conduct of Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Ms. Lopez's and Ms. Romero's rights and feelings, knowing that their actions or inactions would cause Ms. Lopez and Ms. Romero to suffer emotional damage and economic loss.

WHEREFORE, on Count III, Ms. Lopez and Ms. Romero request that judgment be entered against Defendants, FORBA LLC, d/b/a Small Smiles, Inc., jointly and severally, awarding them compensatory and punitive damages, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such further relief as the Court deems proper.

## COUNT IV
### Debra Lopez and Kathy Romero
### New Mexico Human Rights Act – Age Discrimination

181.    Ms. Romero and Ms. Lopez hereby incorporate and re-allege Paragraphs 1 through 180 above as if fully set forth herein.

182.    The New Mexico Human Rights Act, NMSA §28-1-7, *et seq.*, makes it an unlawful and discriminatory practice for an employer to discriminate in the terms and conditions or privileges of employment because a person is over 40 years of age.

52

183.    Defendants, FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees, had a duty by law not to discriminate against Ms. Lopez and Ms. Romero because they are over 40 years of age.

184.    These Defendants violated this duty, as well as NMSA 1978, §28-1-7, *et seq.*, by its aforementioned actions and inaction and by Defendants' creation and perpetuation of an age-discriminating work environment.

185.    As a direct result of the aforesaid conduct by these Defendants, Ms. Lopez and Ms. Romero have suffered and will continue to suffer embarrassment, humiliation, emotional distress, loss of employment and other economic damages. Further, as a direct result of the aforesaid conduct of these Defendants, Ms. Lopez and Ms. Romero have been prevented from performing their normal daily activities and obtaining the full enjoyment of life and have sustained loss of earnings and will continue to incur loss of earnings and other related damages.

186.    The conduct of Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Ms. Lopez's and Ms. Romero's rights and feelings, knowing that their actions or inactions would cause them to suffer emotional damage and economic loss.

WHEREFORE, on Count IV, Ms. Lopez and Ms. Romero request that judgment be entered against Defendants, FORBA LLC, d/b/a Small Smiles, Inc., jointly and severally, awarding them compensatory and punitive damages, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such further relief as the Court deems proper.

## COUNT V
## Monika Sandoval
### New Mexico Human Rights Act - Disability Discrimination

187.    Ms. Sandoval hereby incorporates and re-alleges Paragraphs 1 through 186 above as if fully set forth herein.

188.    The New Mexico Human Rights Act, NMSA §28-1-7, *et seq*., makes it an unlawful and discriminatory practice for an employer to discriminate in the terms and conditions or privileges of employment because a person has a serious medical condition.

189.    Ms. Sandoval was diagnosed with Type II Diabetes, a serious medical condition, and Defendants, FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees, discriminated against her because she had said condition and wrongfully retaliated against her because she missed work because of her condition and unlawfully terminated her from her employment.

190.    As a direct result of the aforesaid conduct by these Defendants, Ms. Sandoval has suffered and will continue to suffer embarrassment, humiliation, emotional distress,  loss of employment and other economic damages.   Further, as a direct result of the aforesaid conduct of these Defendants, Ms. Sandoval has been prevented from performing her normal daily activities and obtaining the full enjoyment of life and has sustained loss of earnings and will continue to incur loss of earnings and other related damages.

191.    The conduct of these Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Ms. Sandoval's rights and feelings, knowing that their actions or inactions would cause her to suffer emotional damage and economic loss.

54

WHEREFORE, on Count V, Ms. Sandoval requests that judgment be entered against Defendants, FORBA LLC, d/b/a Small Smiles, Inc., jointly and severally, awarding her compensatory and punitive damages, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such further relief as the Court deems proper.

## COUNT VI
### Monika Sandoval
### Americans with Disabilities Act of 1990 - Disability Discrimination

192.    Ms. Sandoval hereby incorporates and re-alleges Paragraphs 1 through 191 above as if fully set forth herein.

193.    The Americans with Disabilities Act of 1990, 42 U.S.C. Section 12101, *et seq.*, makes it an unlawful and discriminatory practice for an employer to discriminate in the terms and conditions or privileges of employment because a person has a disability.

194.    Ms. Sandoval was diagnosed with Type II Diabetes, a disabling medical condition, and Defendants, FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees, discriminated against Ms. Sandoval because she had said condition and wrongfully retaliated against her because she missed work because of her condition and unlawfully terminated her from her employment.

195.    As a direct result of the aforesaid conduct by these Defendants, Ms. Sandoval has suffered and will continue to suffer embarrassment, humiliation, emotional distress, loss of employment and other economic damages.  Further, as a direct result of the aforesaid conduct of these Defendants, Ms. Sandoval has been prevented from performing her normal daily activities and

obtaining the full enjoyment of life and has sustained loss of earnings and will continue to incur loss of earnings and other related damages.

196.    The conduct of Defendants set forth above was intentional, willful, malicious, reckless, wanton and/or grossly negligent and was undertaken with a total disregard for Ms. Sandoval's rights and feelings, knowing that their actions or inactions would cause her to suffer emotional damage and economic loss.

WHEREFORE, on Count VI, Ms. Sandoval requests that judgment be entered against Defendants, FORBA LLC, d/b/a Small Smiles, Inc., jointly and severally, awarding her compensatory and punitive damages, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such further relief as the Court deems proper.

**COUNT VII**

**Wrongful Termination and Retaliation in Violation of**
**Title VII, the New Mexico Human Rights Act and**
**the Public Policy of New Mexico**

197.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 196 above as if fully set forth herein.

198.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a), *et seq.*, and the New Mexico Human Rights Act, NMSA §28-1-7, *et seq.*, declare that it is unlawful for an employer to discriminate and/or retaliate against and/or wrongfully terminate an employee who opposes a practice made unlawful pursuant to the terms of Title VII or the New Mexico Human Rights Act.

56

199.    Defendants, FORBA LLC, d/b/a Small Smiles, Inc., and its supervising employees, retaliated against Plaintiffs, including initiating the actual and/or constructive termination of their employment, after Plaintiffs had reported unlawful discrimination and harassment to Defendants, and such misconduct constitutes unlawful retaliation and wrongful termination pursuant to Title VII and the New Mexico Human Rights Act.

200.    The refusal of these Defendants to abide by their legal obligation to protect the rights of Plaintiffs and to accommodate them in order to ensure their safety and freedom from discrimination in the workplace resulted in the wrongful termination of Plaintiffs' employment with Small Smiles in violation of the aforementioned federal and state statutes.

201.    In addition, public policy of New Mexico forbids retaliation against and wrongful termination of employees, like Plaintiffs, who "blow the whistle" on and/or lodge complaints about and/or oppose illegal activities perpetrated in the workplace. Therefore, these Defendants' retaliation against and/or termination of Plaintiffs for reporting and/or opposing the illegal and unprofessional misconduct described above violated New Mexico public policy and was unlawful and wrongful, entitling Plaintiffs to recover actual and compensatory damages from these Defendants.

202.    Defendants' actions were intentional, willful, malicious, reckless, wanton, grossly negligent and deliberately indifferent to Plaintiffs' rights and feelings, thereby entitling Plaintiffs to an additional award of punitive damages.

203.    As a result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer economic damages, embarrassment, humiliation and severe emotional distress, as well as other related damages.

57

WHEREFORE, on Count VII, Plaintiffs request that judgment be entered against the Defendants, FORBA LLC, d/b/a Small Smiles. Inc., jointly and severally, awarding Plaintiffs compensatory and punitive damages, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees and such further relief as the Court deems proper.

## COUNT VIII
### Intentional Infliction of Emotional Distress

204.    Plaintiffs hereby incorporate and reallege Paragraphs 1 through 203 above as if fully set forth herein.

205.    Defendants intended (or acted with reckless indifference to the consequences of their acts and/or omissions) and/or knew or should have known that their acts and omissions as described above would cause  Plaintiffs to suffer severe and extreme emotional distress, yet Defendants nevertheless perpetrated said misconduct, proximately resulting in severe and extreme emotional distress and other harm to Plaintiffs.

206.    As a result of this infliction of emotional distress upon Plaintiffs by Defendants, Plaintiffs have suffered embarrassment, humiliation, loss of their careers, economic damage and severe and extreme emotional distress, for which Defendants are jointly and severally liable to Plaintiffs.

207.    This infliction of emotional distress upon Plaintiffs was undertaken intentionally, willfully, maliciously, recklessly, wantonly and/or with gross negligence and or deliberate indifference to Plaintiffs' rights and feelings, thereby entitling Plaintiffs to an additional award of punitive damages.

58

WHEREFORE, on Count VIII, Plaintiffs request that judgment be entered against all Defendants, jointly and severally, awarding them compensatory and punitive damages, together with pre-judgment interest, post-judgment interest and costs and such further relief as the Court deems proper.

## COUNT IX
### Shantel Ulibarri, Debra Lopez and Kathy Romero
### Physical and/or Psychological Assault, Battery and/or Sexual Assault

208.    Plaintiffs hereby incorporate and re-allege paragraphs 1 through 207 above as if fully set forth herein.

209.    Dr. McQuitty sexually, psychologically and/or physically and/or sexually assaulted Ms. Ulibarri and Ms. Lopez.  This abuse consisted of unlawful and offensive touching of Ms. Ulibarri and Ms. Lopez and constituted sexual assault and battery upon their persons.  Additionally, Dr. McQuitty and Mr. Neil battered Ms. Lopez and Ms. Romero by intentionally placing No Doz in their coffee and making them very ill to the point of vomiting. This misconduct constitutes battery, as well as intentional infliction of emotional distress.  Finally, Dr. DeRose also sexually assaulted and battered Ms. Lopez by physically rubbing his chest against Ms. Lopez's breasts when he would hug her. The actions of Dr. McQuitty, Dr. DeRose and Mr. Neil caused Plaintiffs to be apprehensive that they would unlawfully and/or physically and/or sexually touch them and, in fact, resulted in unlawful sexual and/or physical touching and/or sexual abuse of Ms. Ulibarri and Ms. Lopez.

210.    The misconduct of Dr. McQuitty and Mr. Neil, as set forth herein, occurred while they were employees of Small Smiles/FORBA, acting within the course and scope of their employment.   The misconduct of Dr. DeRose, as set forth herein, occurred while he was an

59

owner/employee of Small Smiles/FORBA, acting within the course and scope of his employment.

Small Smiles and/or FORBA are therefore liable for the misconduct of Dr. McQuitty and/or Dr.

DeRose and/or Mr. Neil because Dr. McQuitty and/or Dr. DeRose were managing representatives

of these companies, these companies knew or should have known that this illegal misconduct was

occurring and/or FORBA and/or Small Smiles also ratified and/or condoned the misconduct when

the misconduct was discovered by these companies. Therefore, FORBA and/or Small Smiles are

also liable for the injuries and damages suffered by Ms. Ulibarri, Ms. Lopez and Ms. Romero which

proximately resulted from these Defendants' actions and omissions.

211.   As a direct and proximate result of the conduct of these Defendants, Ms. Lopez, Ms.

Romero and Ms. Ulibarri have suffered and will continue to suffer physical injury, severe and

extreme emotional distress, embarrassment, humiliation and loss of self-esteem. They have also

been prevented from and will continue to be prevented from performing their normal daily activities

and obtaining full enjoyment of life, have incurred and will incur expenses for medical treatment and

psychological counseling and have incurred and will continue to incur other related damages,

including, but not limited to, lost earnings and future loss of earning capacity.

212.   Dr. McQuitty's, Dr. DeRose's and Mr. Neil's actions were malicious, willful, wanton,

grossly negligent and/or performed with reckless disregard for the rights and feelings of Ms. Lopez,

Ms. Romero and Ms. Ulibarri, thereby entitling them to an award of punitive damages.

WHEREFORE, on Count IX, Ms. Ulibarri, Ms. Lopez and Ms. Romero pray for judgment

against, and compensatory and punitive damages from all Defendants, jointly and severally, in an

appropriate amount, together with pre-judgment interest, post-judgment interest, attorneys fees, costs

and such further relief as the Court deems proper.

## COUNT X

### Negligent Hiring, Training, Retention, Management and Supervision

213.     Plaintiffs hereby incorporate and re-allege paragraphs 1 through 212 above as if fully set forth herein.

214.     Defendants had a duty to hire and retain only such employees that would foster and maintain a safe environment for Plaintiffs, other female employees  and other young patients of Small Smiles and to properly manage the personnel activities and business of the clinic to insure that all potentially offending employees were properly trained and supervised and that there were appropriate reporting mechanisms in place so they would not create a sexually, physically, psychologically, discriminatory and/or hostile work environment for female employees, specifically Plaintiffs.

215.     Defendants breached the above-mentioned duty by failing to properly screen for hire, adequately train and/or supervise the behavior of Dr. DeRose, Dr. Takaki, Dr. McQuitty and/or Mr. Neil with respect to their interaction with female employees, patients and parents at Small Smiles in order to insure the physical integrity and emotional well-being of all female employees and to insure that no sexual activity occurred in the clinic, whether consensual or otherwise, directed toward or concerning patients, parents of patients and/or female employees.

216.     Defendants breached the above-mentioned duty by allowing Dr. DeRose, Dr. McQuitty , Dr. Takaki and/or Mr. Neil to sexually harass, discriminate against, assault and batter the female employees, including even after Defendants were alerted  to the fact that one or more of these individuals were engaged in such illegal and/or harmful behavior.  Defendants also negligently, recklessly and/or intentionally failed to initiate a prompt and thorough investigation of any of the

61

aforesaid misconduct and/or take any appropriate disciplinary action against any of the aforesaid offenders after receiving notice that such misconduct may be occurring, which failures caused Plaintiffs to suffer additional damage.

217.    As a direct and proximate result of the breach of duty and misconduct of Defendants, Plaintiffs have suffered and will continue to suffer physical injury, severe and extreme emotional distress, embarrassment, humiliation and loss of self-esteem.   Plaintiffs have also been prevented from and will continue to be prevented from obtaining full enjoyment of life, have incurred and will incur other related damages, including, but not limited to, lost earnings and future loss of earnings and earning capacity.

218.    The actions and/or omissions of Defendants were malicious, willful, wanton, grossly negligent and/or performed with reckless disregard for Plaintiffs' rights and feelings, thereby entitling Plaintiffs to an additional award of punitive damages.

WHEREFORE, on Count X, Plaintiffs pray for judgment against, and compensatory and punitive damages from, Defendants in an appropriate amount, together with pre-judgment interest, post-judgment interest, costs and such further relief as the Court deems proper.

## COUNT XI

### Breach of Contract and/or Intentional Interference With Contract

219.    Plaintiffs hereby incorporate and re-allege paragraphs 1 through 218 above as if fully set forth herein.

220.    Each Plaintiff had a contract of employment with Defendants FORBA and/or Small Smiles, and implied in each such contract was a covenant of good faith and fair dealing which

imposed upon Defendants a duty to, at all times, deal with Plaintiffs fairly, with respect and in good faith. Defendants breached and/or interfered with these covenants and the contracts of Plaintiffs by committing the aforesaid misconduct in bad faith, proximately resulting in emotional distress and other damage suffered by Plaintiffs, to include, but not limited to, the constructive and/or actual wrongful termination of Plaintiffs' employment. Such breaches and/or intentional interferences with Plaintiffs' contracts of employment have caused each Plaintiff to suffer actual and consequential damages.

221.    As a direct and proximate result of the breaches of duty and above-mentioned misconduct of Defendants, Plaintiffs have suffered and will continue to suffer physical injury, severe and extreme emotional distress, embarrassment, humiliation and loss of self-esteem. Plaintiffs have also been prevented from and will continue to be prevented from obtaining full enjoyment of life and have incurred and will incur other related damages, including, but not limited to, lost earnings and future loss of earnings and earning capacity.

222.    The actions and/or omissions of Defendants were malicious, willful, wanton, grossly negligent and/or performed with reckless disregard for Plaintiffs' rights and feelings, thereby entitling Plaintiffs to an additional award of punitive damages.

WHEREFORE, on Count XI, Plaintiffs pray for judgment against, and compensatory and punitive damages from, Defendants in an appropriate amount, together with pre-judgment interest, post-judgment interest, costs and such further relief as the Court deems proper.

## COUNT XII
### Civil Conspiracy

223.    Plaintiffs hereby incorporate and re-allege paragraphs 1 through 222 above as if fully set forth herein.

224.    All Defendants and/or any combination of them conspired to foster or permit to be fostered a sexually and/or physically abusive, harassing, discriminatory and/or hostile work environment for female employees in Small Smiles clinics, likely around the nation, but specifically at the clinic in Santa Fe, New Mexico. Each of the Defendants, individually and/or in combination with one or more of the other Defendants, committed one or more acts or omissions in furtherance of said conspiracy, thus proximately causing the Plaintiffs to suffer harm.

225.    As a direct and proximate result of the above-mentioned misconduct of Defendants, Plaintiffs have suffered and will continue to suffer physical injury, severe and extreme emotional distress, embarrassment, humiliation and loss of self-esteem. Plaintiffs have also been prevented from and will continue to be prevented from obtaining full enjoyment of life and have incurred and will incur other related damages, including, but not limited to, lost earnings and future loss of earnings and earning capacity.

226.    The actions and/or omissions of Defendants were malicious, willful, wanton, grossly negligent and/or performed with reckless disregard for Plaintiffs' rights and feelings, thereby entitling Plaintiffs to an additional award of punitive damages.

WHEREFORE, on Count XII, Plaintiffs pray for judgment against, and compensatory and punitive damages from, Defendants in an appropriate amount, together with pre-judgment interest, post-judgment interest, costs and such further relief as the Court deems proper.

64

## COUNT XIII
### Prima Facie Tort

227.    Plaintiffs hereby incorporate Paragraphs 1 through 226 above as if fully set forth n herein.

228.    All Defendants owed Plaintiffs a duty to refrain from causing Plaintiffs to suffer physical and/or emotional harm and/or economic loss.

229.    All Defendants breached this duty to Plaintiffs by aiding and/or abetting and/or soliciting and/or causing and/or threatening physical and/or sexually offensive touching, offensive harassment, discriminatory mistreatment and/or wrongful termination of Plaintiffs' employment which proximately resulted in the damage to Plaintiffs described above.

230.    Notwithstanding any duty which any Defendant may have owed to Plaintiffs, Defendants' acts and/or omissions were accomplished purposefully and/or with disregard for their consequences, setting in motion events that resulted in harm to Plaintiffs for which Defendants are liable for their particular acts and/or omissions as described above.

231.    The palpable physical, emotional and economic harm resulting from Defendants' utter disregard for Plaintiffs and their general knowledge of the harm that could result from acting or failing to act in the manner described above demonstrate that Defendants' activities were beyond the bounds of what society should tolerate, weighing against any justifications Defendants may put forward.

232.    Defendants' acts and omissions were accomplished intentionally, recklessly, willfully, wantonly and/or with deliberate indifference to Plaintiffs' rights and feelings, and Plaintiffs are

therefore entitled to recover from Defendants, jointly and severally, in addition to their actual and consequential damages, punitive damages in an amount to be determined by a jury to be sufficient to punish Defendants for their unlawful conduct and to deter others who would contemplate similar behavior not to be tolerated in this community.

WHEREFORE, on Count XIII, Plaintiffs pray for judgment against Defendants, jointly and severally, for their actual and consequential damages, punitive damages, costs and pre- and post-judgment interest and for such other and further relief as the Court shall deem just and proper.

Respectfully submitted,

BENNETT & KOSH

By_____
Merit Bennett
Talia V. Kosh
460 St. Michael's Drive, Ste. 703
Santa Fe, New Mexico 87505
(505) 983-9834
Attorneys for Plaintiffs

66